## TAX COURT OF NEW JERSEY

**JOSHUA D. NOVIN**
**Judge**



Dr. Martin Luther King, Jr. Justice Building
495 Dr. Martin Luther King, Jr. Blvd., 4th Floor
Newark, New Jersey 07102
Tel: (609) 815-2922, Ext. 54680

## NOT FOR PUBLICATION WITHOUT THE APPROVAL
## OF THE TAX COURT COMMITTEE ON OPINIONS

January 19, 2023

Lee S. Holtzman, Esq.
Farhan Ali, Esq.
McCarter & English, LLP
Four Gateway Center
100 Mulberry Street
Newark, New Jersey 07102

Richard P. DeAngelis, Esq.
Connell Foley, LLP
56 Roseland Avenue
Roseland, New Jersey 07068

    Re:    <u>OTR-MCC, LLC v. Parsippany-Troy Hills Township</u>
            Docket Nos. 001742-2009, 001149-2010, 001289-2011, 004558-2012,
            000871-2013, 003789-2014, and 003704-2015

            and

            <u>Brookwood MC INV. I & II % CBRE v. Parsippany-Troy Hills Township</u>
            Docket Nos. 004516-2016, 001685-2017, 001124-2018, and 002857-2019

Dear Mr. Holtzman, Mr. Ali, and Mr. DeAngelis:

This letter shall constitute the court's opinion following trial of the local property tax appeals instituted by plaintiffs, OTR-MCC, LLC ("OTR-MCC") and Brookwood MC INV. I & II % CBRE ("Brookwood") (OTR-MCC and Brookwood shall be collectively referred to herein as "OTR-MCC/Brookwood"). OTR-MCC/Brookwood challenge the 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments on their improved property located in Parsippany-Troy Hills Township ("Parsippany").

For the reasons stated more fully below, the court affirms the 2009, 2010, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments and reduces the 2011 and 2012 tax year

1

assessments.

### I.  Procedural History and Findings of Fact

Pursuant to R. 1:7-4, the court makes the following findings of fact and conclusions of law based on the evidence and testimony adduced during trial.[1]

As of the valuation dates, OTR-MCC/Brookwood was the owner of the real property and improvements located at 300 Interpace Parkway and 1 Upper Pond Road, Parsippany-Troy Hills Township, Morris County, New Jersey (the "subject property"). The subject property is identified on the Parsippany-Troy Hills municipal tax map as Block 136, Lot 43.4. The subject property contains approximately 2,028 feet of frontage along Interpace Parkway and 1,124 feet of frontage along Upper Pond Road. The subject property is located near the intersection of Interpace Parkway and Cherry Hill Road, with nearby access to Routes 80, 46, 202, and 287.

The subject property is more commonly known as Morris Corporate Center I ("MCC I") and Morris Corporate Center II ("MCC II").[2] MCC I and MCC II are two detached Class A, multi-tenanted office buildings on the Morris Corporate Center campus, containing a total of approximately 529,362 square feet of leasable area. MCC I and MCC II each comprise three (3)

---

[1] Trial was commenced before Hon. Vito Bianco, J.T.C. However, following the second day of trial, Judge Bianco determined that he would be unable to conclude trial and render an opinion in the above matters and they were reassigned to the undersigned. With the consent of all counsel, the court reviewed the exhibits marked for identification and listened to the testimony elicited during the first two days of trial on the court's audio recording system and reviewed the transcripts.

[2] Prior to the commencement of trial, OTR-MCC/Brookwood and Parsippany executed a Joint Stipulation of Fact. The Joint Stipulation set forth: (i) the subject property's address as 300 Interpace Parkway and 1 Upper Pond Road; (ii) the subject property comprises two detached Class A office buildings constructed in 1986; (iii) the highest and best use of the subject property is its continued use as Class A office space; (iv) the subject property comprises 529,362 square feet of leasable area; (v) the subject property's total tax assessment during each year under appeal is $57,660,700; (vi) that OTR-MCC/Brookwood's proposed expert and Parsippany's proposed expert are qualified as valuation experts; and (vii) the effective tax rates for each year under appeal.

attached office buildings, referred to as pods. MCC I contains pods A, B, and C, while MCC II contains pods D, E, and F. Pods A, C, D, and F are three-story office buildings constructed over a one-story parking garage. Pods B and E are four-story office buildings. The subject property contains a total of 1,597 parking spaces, 1,352 are surface parking and 245 are covered parking (below the pod buildings). MCC I and MCC II were constructed in 1986 of steel frame and masonry/granite panel walls, intermixed with bands of reflective insulated glass windows.[3] The buildings are situated on an irregularly shaped 30.83-acre site.

MCC I and MCC II feature amenities including renovated multi-story atrium lobbies with skylight ceilings, granite tile floors, marble and wood panel covered walls, eight passenger elevators, a shared conference center, a three-hole putting green, a one and a half mile jogging/walking trail, and an outdoor seating area. MCC I and MCC II are fully sprinklered. MCC I and MCC II are surrounded by grassy areas, decorative trees, and shrubs. An oversized retention pond featuring fountains and a waterfall element is located between MCC I and MCC II. Each floor features men's and women's restrooms (renovated in 2005), finished with granite countertops and backsplashes, and granite/marble tile flooring. In addition, MCC I and MCC II each contain a cafeteria offering on-site catering and a private dining/conference room. There is also a fitness facility located on-site. Tenants have access to dry cleaning and shoe-shine services, an ATM, and car wash services. MCC I and MCC II also feature an on-site security guard, closed circuit television monitors, and a key card access system. MCC I and MCC II are each serviced by loading areas with direct access to four freight elevators.

---

[3] According to OTR-MCC/Brookwood's expert (as such term is defined herein), the subject property was developed in the 1980's by SJP Properties and Prudential and was sold in December 1999 to OTR-MCC (the State Teachers Retirement System of Ohio), for $95,000,000.

The buildings' interior common hallways and tenant offices are generally finished with acoustic tile ceilings, painted and vinyl covered drywall, recessed lighting, and wood composite flooring or carpeting. Ceramic tile flooring is installed in tenant kitchen areas and tenant bathrooms. Each pod floor is serviced by its own central heating and air conditioning unit, located on the buildings' roof.

The subject property is in Parsippany-Troy Hills Specialized Economic Development area, SED-5, with permitted uses including: offices for executive or administrative purposes, scientific or research laboratories, fabrication and assembly of products, processing and warehousing facilities for finished products, agricultural uses, and mobile food vendor establishments.[4] Thus, use and operation of the subject property as a Class A, multi-tenanted office building, is a legally permitted and conforming use.

Conflicting testimony was offered regarding the subject property's Flood Hazard Zone designation. According to OTR-MCC/Brookwood's expert (as such term is defined herein), the subject property is in Flood Zone "C" or an "area[] of minimal flood hazard."[5] However, according to Parsippany's expert (as such term is defined herein), the subject property is located in Special Flood Hazard Area "X" or a "[m]oderate flood hazard area[]."[6]

OTR-MCC/Brookwood timely filed direct appeal complaints with the Tax Court challenging the subject property's 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 tax year assessments. Parsippany filed counterclaims for the 2009, 2010, 2011, 2012,

---

[4]  OTR-MCC/Brookwood's expert's (as such term is defined herein) appraisal reports also identified digital storage warehouse as a permitted use in the SED-5 zoning district.
[5]  https://www.fema.gov/glossary/flood-zones.
[6]  The subject property's location in either Flood Zone "C" or Special Flood Hazard Area "X" does not impact the court's determination of the subject property's true value.

2013, 2014, 2015 2016, 2017, 2018, and 2019 tax years. The matters were tried to conclusion over several months.

During trial, OTR-MCC/Brookwood and Parsippany each offered testimony from New Jersey certified general real estate appraisers who were accepted by the court as experts in the field of property valuation (the "expert" or "experts").[7] Each expert prepared appraisal reports expressing their opinions of the subject property's true or fair market value as of the October 1, 2008, October 1, 2009, October 1, 2010, October 1, 2011, October 1, 2012, October 1, 2013, October 1, 2014, October 1, 2015, October 1, 2016, October 1, 2017, and October 1, 2018 valuation dates.[8]

As of each valuation date, the subject property's local property tax assessments, implied equalized values, and the experts' value conclusions are set forth below:

| Valuation date | Local property tax assessment | Average ratio of assessed to true value | Implied equalized value | OTR-MCC/ Brookwood's expert | Parsippany's expert |
|---|---|---|---|---|---|
| 10/1/2008 | $57,660,700 | 76.31% | $75,561,132 | $46,200,000 | $79,450,000 |
| 10/1/2009 | $57,660,700 | 77.19% | $74,699,702 | $45,700,000 | $76,315,000 |
| 10/1/2010 | $57,660,700 | 79.34% | $72,675,447 | $49,800,000 | $83,230,000 |
| 10/1/2011 | $57,660,700 | 80.74% | $71,415,284 | $47,000,000 | $80,265,000 |
| 10/1/2012 | $57,660,700 | 85.61% | $67,352,763 | $45,100,000 | $79,950,000 |
| 10/1/2013 | $57,660,700 | 84.94% | $67,884,036 | $43,800,000 | $76,990,000 |
| 10/1/2014 | $57,660,700 | 84.41% | $68,310,271 | $41,400,000 | $77,905,000 |
| 10/1/2015 | $57,660,700 | 84.40% | $68,318,365 | $41,300,000 | $78,075,000 |
| 10/1/2016 | $57,660,700 | 83.15% | $69,345,400 | $32,100,000 | $80,265,000 |
| 10/1/2017 | $57,660,700 | 83.74% | $68,856,819 | $31,900,000 | $79,650,000 |
| 10/1/2018 | $57,660,700 | 83.40% | $69,137,530 | $31,700,000 | $79,000,000 |

---

[7] OTR-MCC/Brookwood and Parsippany stipulated to each expert's qualifications.

[8] OTR-MCC/Brookwood's expert was initially retained to, and prepared, appraisal reports for the subject property for the 2010 to 2016 tax years, dated May 5, 2017 under the Integra Realty Resources banner. However, OTR-MCC/Brookwood's expert subsequently transitioned to a new firm, Newmark Knight Frank, and prepared appraisal reports for the subject property for the 2009 tax year and 2017 to 2019 tax years under their banner.

During the valuation periods at issue, OTR-MCC sold the subject property to Brookwood, under deed dated April 28, 2014, for reported consideration of $82,400,000. The deed was recorded in the Morris County Clerk's Office in Deed Book 22525, Page 1076.

Testimony further revealed that on or about December 6, 2019, approximately fourteen months after the latest valuation date involved herein, Brookwood entered into a Purchase and Sale Agreement with Monarch Owner, LLC to sell the subject property. That sale was reportedly consummated for $58,500,000, under deed dated March 9, 2020, and recorded on March 12, 2020 in the Morris County Clerk's Office in Deed Book 23730, Page 1717.

## II. Conclusions of Law

### a. Presumption of Validity

"Original assessments and judgments of county boards of taxation are entitled to a presumption of validity." MSGW Real Estate Fund, LLC v. Mountain Lakes Borough, 18 N.J. Tax 364, 373 (Tax 1998). "Based on this presumption, the appealing taxpayer has the burden of proving that the assessment is erroneous." Pantasote Co. v. Passaic City, 100 N.J. 408, 413 (1985). "The presumption of correctness . . . stands, until sufficient competent evidence to the contrary is adduced." Little Egg Harbor Twp. v. Bonsangue, 316 N.J. Super. 271, 285-86 (App. Div. 1998). A taxpayer can only rebut the presumption by introducing "cogent evidence" of true value. Pantasote Co., 100 N.J. at 413. That is, evidence "definite, positive and certain in quality and quantity to overcome the presumption." Aetna Life Ins. Co. v. Newark City, 10 N.J. 99, 105 (1952). Thus, at the close of the proofs by the party challenging the tax assessment, the court must be presented with evidence that raises a "debatable question as to the validity of the assessment." MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376.

Here, at the close of OTR-MCC/Brookwood's proofs, Parsippany moved to dismiss these

matters, under R. 4:37-2(b), arguing that OTR-MCC/Brookwood failed to overcome the presumption of validity. Specifically, Parsippany argued that disparities existed in the manner that OTR-MCC/Brookwood's expert calculated the "effective" rent for the subject property and his comparable leased properties. Thus, Parsippany charged that OTR-MCC/Brookwood's expert's conclusions of value should be accorded no weight. Additionally, Parsippany asserted that there were misstatements and errors contained in OTR-MCC/Brookwood's expert's appraisal reports, rendering his value conclusions of dubious usefulness.

Affording OTR-MCC/Brookwood all reasonable and legitimate inferences which could be deduced from the evidence presented, the court concluded that OTR-MCC/Brookwood produced cogent evidence sufficient to overcome the presumption of validity. See MSGW Real Estate Fund, LLC, 18 N.J. Tax at 376 (citing Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520 (1995)). The court found that the opinions of OTR-MCC/Brookwood's expert, if accepted as true, raised debatable questions as to the validity of the subject property's local property tax assessments. Accordingly, the court denied Parsippany's motions and placed a statement of reasons on the record.

However, concluding that the presumption of validity has been overcome does not equate to a finding by the court that the local property tax assessments are erroneous. Once the presumption has been overcome, "the court must then turn to a consideration of the evidence adduced on behalf of both parties and conclude the matter based on a fair preponderance of the evidence." Ford Motor Co. v. Edison Twp., 127 N.J. 290, 312 (1992). The court must be mindful that "although there may have been enough evidence [presented] to overcome the presumption of correctness at the close of plaintiff's case-in-chief, the burden of proof remain[s] on the [party challenging the tax assessment] . . . to demonstrate that the judgment under review was incorrect."

Id. at 314-15 (citing Pantasote Co., 100 N.J. at 413).

    b.    Highest and Best Use

"For local property tax assessment purposes, property must be valued at its highest and best use." Entenmann's Inc. v. Totowa Borough, 18 N.J. Tax 540, 545 (Tax 2000). The highest and best use analysis is a concept rooted in the market's perceptions of value, because it answers the inquiry, "[w]hat use would the market make of that property?" Ford Motor Co., 127 N.J. at 302 (citation omitted). To accurately answer that question, an appraiser must conduct "a comprehensive market analysis to ascertain the supply and demand characteristics of alternative uses." Clemente, 27 N.J. Tax at 269. Thus, the highest and best use analysis is the starting point in the court's journey to discern a property's true or fair market value. See Ford Motor Co. v. Edison Twp., 10 N.J. Tax 153, 161 (Tax 1988) (concluding that the highest and best use analysis is "the first and most important step in the valuation process").

Here, OTR-MCC/Brookwood and Parsippany stipulated that the subject property's highest and best use was its "continued use as an office property."[9] The court finds the parties stipulation is reasonable and supported by the evidence. Therefore, the court concludes that the subject property's highest and best use "as improved," is its continued use as an office building.

    c.    Valuation

"There is no single determinative approach to the valuation of real property." 125 Monitor St. LLC v. City of Jersey City, 21 N.J. Tax 232, 237-38 (Tax 2004), aff'd, 23 N.J. Tax 9 (App. Div. 2005) (citing Samuel Hird & Sons, Inc., 87 N.J. Super. at 72); see also ITT Continental Baking

---

[9] The Joint Stipulation does not identify the subject property's "as vacant" highest and best use. However, based on the testimony and evidence adduced during trial, the court finds that the subject property's "as vacant" highest and best use would be development with an office building.

Co. v. East Brunswick Twp., 1 N.J. Tax 244 (Tax 1980). "There are three traditional appraisal methods utilized to predict what a willing buyer would pay a willing seller on a given date, applicable to different types of properties: the comparable sales method, capitalization of income and cost." Brown v. Borough of Glen Rock, 19 N.J. Tax 366, 376 (App. Div. 2001) (internal citation omitted). "The decision as to which valuation approach should predominate depends upon the facts of the particular case and the reaction to these facts by the experts." Coca-Cola Bottling Co. of N.Y. v. Neptune Twp., 8 N.J. Tax 169, 176 (Tax 1986) (citing New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537, 544 (1963)); see also WCI-Westinghouse, Inc. v. Edison Twp., 7 N.J. Tax 610 (Tax 1985).

### 1. Income Capitalization Approach

When a property is income-producing, the income capitalization approach is the "preferred method for estimating the value of income producing property." Forsgate Ventures IX, L.L.C. v. Twp. of South Hackensack, 29 N.J. Tax 28, 46 (Tax 2016), aff'd, 31 N.J. Tax 135 (App. Div. 2018). "The income capitalization approach to value consists of methods, techniques, and mathematical procedures that an appraiser uses to analyze a property's capacity to generate benefits (i.e., usually the monetary benefits of income and reversion) and convert[s] these benefits into an indication of present value." Appraisal Institute, The Appraisal of Real Estate, 439 (14th ed. 2013).

A fundamental tenet of the income capitalization approach is the concept of anticipation, a process designed to forecast future economic benefits and convert those benefits into a present value estimate. Id. at 440. The income capitalization approach converts the anticipated future stream of income and reversionary benefit into a present value. Stated differently, the "value of income-producing real estate is based on the income it will produce in the future . . . . the principle

of anticipation, [is] the present worth of future benefits." First Republic Corp. of Am. v. E. Newark Borough, 16 N.J. Tax 568, 578 (Tax 1997). Thus, in valuing income-producing property, "[t]he ultimate concern is the future . . . , the direction and expected rate of income change are critical to the capitalization of income as a valuation approach." Ibid.

Here, both OTR-MCC/Brookwood's expert and Parsippany's expert concluded, and the court agrees, that the income capitalization approach is the most appropriate method to derive the subject property's estimated true or market value.

A.    Economic or Market Rent

The first step under the income-capitalization approach is forecasting a property's potential gross income. This requires an appraiser to discern "the economic rent, also known as the 'market rent' or 'fair rental value.'" Parkway Vill. Apartments Co. v. Cranford Twp., 108 N.J. 266, 270 (1987). The term economic or market rent refers to "the most probable rent that a property should bring in a competitive and open market reflecting all conditions and restrictions of the lease agreement, including permitted uses, use restrictions, expense obligations, term, concessions, renewal and purchase options and tenant improvements." Appraisal Institute, The Dictionary of Real Estate Appraisal, 121-22 (5th ed. 2010). The economic or market rent allows an appraiser to determine the anticipated income stream to be generated from the property and to convert that future income stream into a present value. First Republic Corp. of Am., 16 N.J. Tax at 578.

Here, one of the central issues in dispute revolves around how each expert calculated the "effective" rent of the subject property's leases and their comparable leases. Effective rent is an analytical tool employed by valuation experts to account for, compare, and contrast lease terms, step-up provisions, and other financial concessions afforded under comparable leases in the marketplace, to assist the expert in developing a credible economic or market rent. In sum, the

calculation of "effective" rent is a mechanism that allows an appraiser to consider the step-up rent payable under a lease, along with any financial or rent concessions afforded, in attempting to compare leases and discern economic or market rent.

> 1.  OTR-MCC/Brookwood's expert

In determining the economic or market rent that should be ascribed to the subject property, OTR-MCC/Brookwood's expert: (i) reviewed the REIS Office Market publication identifying asking rents in the Parsippany-Troy Hills office submarket; (ii) examined the subject property's leasing activities from 2006 to 2018[10]; (iii) assembled a "Peer Group (Competitive Set)" of approximately thirty-one Class A office buildings in the Parsippany-Troy Hills office submarket; and (iv) identified fifty (50) comparable Class A office leases (ten for the 2009 tax year, twenty for the 2010 to 2016 tax years, and twenty for the 2017 to 2019 tax years).

In calculating the "effective" rent per square foot of the subject property's leases and the comparable office leases, OTR-MCC/Brookwood's expert testified that he

> calculated the average rent over a five-year period for each of the leases that I analyzed . . . I thought a five-year period was long enough to reflect, you know, free rent that's usually given at the beginning of the lease and any kind of steps that might occur during the first five years of the lease term.

> A lot of these leases went beyond five years but it's not proper to go too far into the future with averaging a rent . . . what I'm trying to do is identify what's an initial effective rent, that's from the market that an owner or investor would expect to get from the property in order so that they can calculate a net income for the property.

---

[10] OTR-MCC/Brookwood's expert grouped the subject property's forty-seven (47) leases as follows: (i) thirteen (13) leases for the 2009 and 2010 tax years; (ii) twelve (12) leases for the 2011, 2012, and 2013 tax years; (iii) eight (8) leases for the 2014, 2015, and 2016 tax years; and (iv) sixteen (16) leases for the 2017, 2018, and 2019 tax years (certain leases were applied to overlapping periods).

Thus, to determine the "effective" rent of the subject property leases and the comparable office leases, OTR-MCC/Brookwood's expert averaged the annual rent "during the lesser of the actual lease term or the first five years of each lease." For example, if a subject property lease or comparable office lease bore a ten-year lease term with an initial rent of $20.00, stepping up $1.00 per square foot annually to $29.00 per square foot over the lease term, OTR-MCC/Brookwood's expert averaged only the first five years rent, and applied an "effective" rent of $22.00 per square foot ($20 + $21 + $22 + $23 + $24 = 110/5 = $22.00), disregarding any rent payable thereafter.

In OTR-MCC/Brookwood's expert's opinion,

> [t]ime value of money's another reason why you wouldn't want to average a rent over a long period of time . . . if I was going to do an average over a long period of time, say ten years, I would be giving equal weight to the rent paid in year ten versus rent paid in year one so it would be improper. You'd get a . . . skewed indication of market rent if you go out too far because of the time value of money.

After applying his formula to the subject property's leases, OTR-MCC/Brookwood's expert concluded that the subject property's "effective" rents: (i) for the 2009 tax year, ranged from $24.73 to $31.80 per square foot, with an average of $26.47;[11] (ii) for the 2010 tax year, ranged from $20.30 to $31.80 per square foot, with an average of $27.08;[12] (iii) for the 2011 tax year, ranged from $23.32 to $26.23, with an average of $24.91; (iv) for the 2012 tax year, ranged from $24.65 to $27.47, with an average of $26.37; (v) for the 2013 tax year, ranged from $25.29 to $28.75, with an average of $26.97; (vi) for the 2014 tax year, ranged from $26.54 to $28.55, with an average of $28.04; (vii) for the 2015 tax year, ranged from $27.52 to $29.50, with an

---

[11] OTR-MCC/Brookwood's expert's November 18, 2019 appraisal report.
[12] OTR-MCC/Brookwood's expert's May 5, 2017 appraisal report, covering the 2010 to 2016 tax years, identifies the range as "subject leases between 2007 & 2010" and having a "date range" of 1/1/2007 to 12/31/2009.

average of $28.51; (viii) for the 2016 tax year, ranged from $22.88 to $28.24, with an average of $25.69[13]; (ix) for the 2017, 2018, and 2019 tax years, ranged from $22.88 to $28.24, with an average of $25.48.[14]

Next, OTR-MCC/Brookwood's expert applied his five-year "effective" rent formula to his fifty comparable office leases. After calculating the "effective" rent of his comparable leases, OTR-MCC/Brookwood's expert applied adjustments to the "effective" rent of several comparable leases to account for perceived differences in expense structure (between 3.5% to 11%) and economic characteristics, including inferior or superior concessions, tenant improvement allowances, or other economic factors that influenced the rental rate (-15% to 10%).

After applying the adjustments, OTR-MCC/Brookwood's expert determined a range of adjusted "effective" rents for his comparable office leases of: (i) $24.73 to $30.49 for the 2009 tax year, with an average of $27.80; (ii) $20.52 to $30.49 for the 2010, 2011, and 2012 tax years, with an average of $25.47; (iii) $18.86 to $26.21 for the 2013, 2014, 2015, and 2016 tax years, with an average of $21.97; (iv) $19.34 to $27.41 for the 2017 tax year, with an average of $24.96; (v) $18.35 to $27.11 for the 2018 tax year, with an average of $23.93; and (vi) $22.68 to $26.34 for the 2019 tax year, with an average of $24.99.[15]

Ultimately, OTR-MCC/Brookwood's expert ascribed a market or economic rent to the subject property's 529,362 square feet of leasable area of: (i) $27.00 per square foot for the 2009,

---

[13] As of the date of the May 5, 2017 date of his appraisal report.

[14] OTR-MCC/Brookwood's expert's range and average includes five (5) leases identified for the 2016 tax year.

[15] OTR-MCC/Brookwood's expert's November 18, 2019 appraisal reports provide a rent range for each calendar year. However, OTR-MCC/Brookwood's expert's May 5, 2017 appraisal report does not provide a range for each calendar year, but rather provides a grouping of the 2010, 2011, and 2012 calendar years, and the 2013, 2014, 2015 and 2016 calendar years.

2010, 2011, and 2012 tax years; (ii) $26.00 per square foot for the 2013 and 2014 tax years; and

(iii) $25.00 per square foot for the 2015, 2016, 2017, 2018, and 2019 tax years.

2. Parsippany's expert

In Parsippany's expert's opinion, Parsippany-Troy Hills "is a market unto its own," thus,

in formulating his opinion of the subject property's economic or market rent, Parsippany's expert

focused his analysis on the subject property leases and comparable leases within the Parsippany-

Troy Hills office submarket. In Parsippany's expert's opinion, the office campus where the subject

property is situated

> is the finest campus that Parsippany has, and this [the subject
> property] is the finest building of the four [buildings on the office
> campus] in the context of their quality, construction, and detail went
> into their constructions, the floors are granite, the walls are wood
> paneled sixteen-foot high, the doors are solid core with brass and
> nickel fixtures, . . . it's an absolute beautiful building, which in large
> part is owing to the fact that their target market is Fortune 500
> companies, large users, so it's as nice a building and, in my opinion,
> the nicest park that Parsippany has to date.

Moreover, Parsippany's expert further expressed that the subject property is "maintained

impeccably" and "is our [Parsippany's] best building," within the Class A buildings in the

Parsippany-Troy Hills submarket.

Parsippany's expert further expressed that, in his opinion, the subject property leases offer

the best indication of the subject property's market or economic rent because they reflect actual

lease agreements during the valuation periods at issue. Thus, in arriving at his economic or market

rent conclusion, Parsippany's expert attributed the greatest weight to the subject property leases.

In gauging the strength of the Parsippany-Troy Hills office submarket, Parsippany's expert

generated two CoStar reports for all classes of buildings in the Parsippany-Troy Hills office

submarket and reviewed the net absorption rates and vacancy rates for the 2008 through 2018

years.  According to Parsippany's expert, from 2008 to 2013, the Parsippany-Troy Hills Class A office submarket experienced steadily increasing vacancy rates, periods of negative net absorption, and thus, declining rental rates.[16]  However, in Parsippany's expert's opinion, because the Parsippany-Troy Hills Class A office submarket generally experienced positive net absorption from 2014 through 2018, along with declining vacancy rates, the Parsippany-Troy Hills submarket became stronger and experienced a corresponding increase in rental rates.

Parsippany's expert identified six subject property leases and seven comparable Class A office leases within the Parsippany-Troy Hills Class A office submarket that he opined were the most representative of the subject property's economic or market rent.  In grouping his comparable office leases, Parsippany's expert employed: (i) four leases for the 2009, 2012, 2013, 2015, 2016, 2017, 2018, and 2019 tax years; (ii) five leases for the 2010 and 2014 tax years; and (iii) six leases for the 2011 tax year.

Unlike the approach adopted by OTR-MCC/Brookwood's expert, in calculating the "effective" rent of his thirteen (13) Class A office leases, Parsippany's expert testified that he

> calculated the rent over the initial term of the lease, ten-year lease, ten-year average; a five-year lease, is a five-year average, I don't manipulate or change the terms, that methodology is the most widely accepted protocol in analyzing a lease, in my mind, . . . it is that marriage, it is that deal between the lessor and the lessee, it is an anticipation of debt service payment, . . . the bigger picture is in analyzing a rent you have to understand all the parties related to that, that a property is sold . . . based on an entire lease term, expectancy of revenue, and it's financed on that basis and it's sold on that basis, so I analyzed it on that basis, so to be consistent with the broader

---

[16]  Absorption rate is defined as "[t]he rate at which properties for sale or lease have been or are expected to be successfully marketed, sold or leased in a given area over a duration of time."  The Dictionary of Real Estate Appraisal at 1.  Thus, a negative net absorption rate would indicate that less space was leased than what was vacated/offered in the marketplace.  Correspondingly, a positive net absorption rate would indicate that more space was leased than what was vacated/offered in the marketplace.

> picture of how investment grade [buildings are] transacted, there is much more going on than an interpretation, . . . capitalization rates are built on that expectancy, in my opinion . . . [it] is the full measure of what the investors can reasonably anticipate, not some formulate that . . . is not parallel to derivation of capitalization rates, the market standing, or the transactions. . . .

Thus, Parsippany's expert accounted for any financial or rent concessions and averaged the annual rent payable over the actual lease term, without consideration of the length of each lease. For example, if a comparably identified office lease bore a ten-year lease term with an initial rent of $20.00, stepping up $1.00 per square foot annually to $29.00 per square foot, Parsippany's expert would apply a rent of $24.50 per square foot to the lease ($20 + $21 + $22 + $23 + $24 + $25 + $26 + $27 + $28 + $29 = $245/10 = $24.50), the average rent payable over the ten-year lease term (in contrast to OTR-MCC/Brookwood's expert who considered only the first five years of the lease and whose "effective" rent would be computed to $22.00 per square foot).

The unadjusted range of Parsippany's expert's thirteen lease rents were: (i) $25.21 to $29.60, for the 2009 tax year, with an average of $27.31; (ii) $25.21 to $36.76, for the 2010 tax year, with an average of $29.20; (iii) $25.21 to $36.76, for the 2011 tax year, with an average of $28.61; (iv) $25.69 to $36.76, for the 2012 tax year, with an average of $30.11; (v) $25.69 to $36.76, for the 2013 tax year, with an average of $31.14; (vi) $24.59 to $33.10, for the 2014 tax year, with an average of $28.56; (vii) $24.59 to $33.10, for the 2015, 2016, and 2017 tax years, with an average of $29.28; (viii) $25.59 to $33.10, for the 2018 tax years, with an average of $28.38; and (ix) $24.59 to $28.80, for the 2019 tax year, with an average of $26.57.

Next, Parsippany's expert applied adjustments to three of the comparable leases (ranging from -5% to 10%) to account for differences in lease type (net and gross versus modified gross). The range of adjusted rents for Parsippany's expert's thirteen comparable leases were: (i) $25.21

to $29.60, for the 2009 tax year, with an average of $27.94; (ii) $25.21 to $36.76, for the 2010 tax year, with an average of $29.70;[17] (iii) $25.21 to $36.76, for the 2011 tax year, with an average of $29.04;[18] (iv) $25.69 to $36.76, for the 2012 tax year, with an average of $30.12; [19] (v) $25.69 to $36.76, for the 2013 tax year, with an average of $31.14; [20] (vi) $25.69 to $33.10, for the 2014 tax year, with an average of $29.06;[21] (vii) $27.05 to $33.10, for the 2015, 2016, and 2017 tax years, with an average of $29.90;[22] (viii) $24.10 to $33.10, for the 2018 tax year, with an average of $28.67;[23] and (ix) $24.10 to $28.80, for the 2019 tax year, with an average of $26.86.

In arriving at his conclusion of economic or market rent, Parsippany's expert placed the greatest weight on the subject property's leases because, although all comparable leases were similarly located in Class A office buildings in the Parsippany-Troy Hills submarket, he viewed the subject property as the "best of the [Class] A" office buildings in the Parsippany-Troy Hills

[17] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 5 should be $34.07 per square foot. Thus, the range of adjusted rents should have been $25.21 to $34.07, for the 2010 tax year, with an average of $29.17.

[18] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 5 should be $34.07 per square foot. Thus, the range of adjusted rents should have been $25.21 to $34.07, for the 2011 tax year, with an average of $28.59.

[19] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 5 should be $34.07 per square foot. Thus, the range of adjusted rents should have been $25.69 to $34.07, for the 2012 tax year, with an average of $29.44.

[20] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 5 should be $34.07 per square foot, and the adjusted rent for Improved Lease No. 8 should be $29.88 per square foot. Thus, the range of adjusted rents should have been $25.69 to $34.07, for the 2013 tax year, with an average of $29.66.

[21] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 8 should be $29.88 per square foot. Thus, the range of adjusted rents should have been $25.69 to $30.44, for the 2014 tax year, with an average of $28.41.

[22] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 8 should be $29.88 per square foot. Thus, the range of adjusted rents should have been $27.05 to $30.44, for the 2015, 2016, and 2017 tax years, with an average of $29.09.

[23] During cross-examination, Parsippany's expert acknowledged that the adjusted rent for Improved Lease No. 8 should be $29.88 per square foot. Thus, the range of adjusted rents should have been $24.10 to $30.44, for the 2018 tax year, with an average of $27.87.

submarket. Ultimately, Parsippany's expert ascribed a market or economic rent to the subject

property's 529,362 square feet of leasable area of: (i) $29.00 for the 2009, 2010, and 2011 tax

years; and (ii) $28.00 for the 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 tax years.

3. Court's analysis

At the outset, the court emphasizes that it finds Parsippany's expert's testimony that the

subject property is one of "the finest campus[es] that Parsippany has" to offer, and that the subject

property is one of the premier Class A office buildings in the Parsippany-Troy Hills marketplace,

to be credible. The photographic evidence and testimony of both experts revealed that the subject

property possesses several striking physical attributes, amenities, and features that are unique and

distinct from other Class A office buildings in the Parsippany-Troy Hills marketplace.

Moreover, the court finds the experts' testimony that rent step-ups and financial/rent

concessions were a staple of the Parsippany-Troy Hills Class A office submarket during the tax

years at issue to be credible. However, the court finds that the methodology employed by both

experts in calculating "effective" rent suffer from potential pitfalls that may materially impact the

accuracy, and thus, the credibility of their economic or market rent conclusions.

As expressed above, the income-capitalization approach is premised on the conversion of

an anticipated stream of income into a present value. As cogently explained by Judge Crabtree,

> Value is created by the anticipation of future benefits. The value of
> income-producing real estate is based on the income it will produce
> in the future. Failure to consider future income contradicts the
> principle of anticipation, *i.e.,* the present worth of future benefits.
> The ultimate concern is the future, and while current income is a
> good starting point, the direction and expected rate of income
> change are critical to the capitalization of income as a valuation
> approach.
>
> Accordingly, where income changes are known, as is the case with
> step-up leases, those increases in income, to the extent they reflect

> economic rent, should be reflected in the appraiser's estimate of the property's future income. The rationale for the step-up lease is the landlord's willingness to accept smaller rent in the early years to assist a tenant in establishing a new business or an old business in a new location. The step-up lease may also reflect the owner's recognition of tenant expenditures, which are, in effect, amortized over the early years of the lease when rent payments are smaller.
>
> [First Republic Corp. of Am., 16 N.J. Tax at 578 (internal citations omitted) (emphasis added).]

Effective rent is defined as "[t]he rental rate net of financial concessions such as periods of free rent during the lease term. . . ." The Appraisal of Real Estate, at 448. Although our courts have consistently found that "economic rent [must] reflect[] rent concessions, which are supported by comparable leases . . . as well as current leases in the subject property itself," no rigid formula has been adopted delineating how "effective" rent should be calculated. Glen Pointe Associates v. Teaneck Twp., 10 N.J. Tax 506, 522 fn3 (Tax 1989), aff'd, 12 N.J. Tax 127 (App. Div. 1991). See also Shav Associates v. Middletown Twp., 11 N.J. Tax 569, 579 (Tax 1991) (concluding that "[i]t is necessary to consider rent concessions in arriving at economic rent").

According to one treatise, effective rent "may be calculated in several different ways. It may be estimated based on rental income from existing leases at market rates and terms, or rental income from leases at market rates and terms, depending on the intended use of the appraisal." Appraisal Institute, The Appraisal of Real Estate, 422 (15th ed. 2020). Therefore, pivotal to either method of calculating "effective" rent is the appraiser's analysis of the marketplace. Only through the appraiser's comprehensive analysis of the leases and marketplace data can he or she discern the anticipated income stream and future economic benefit that the property owner reasonably expects to derive.

When the marketplace demands leases contain rent step-ups, rent concessions, or other

financial incentives, the valuation expert must account for these factors in attempting to discern the economic or market rent because they materially impact the anticipated income stream. Thus, the "effective" rent calculation is intended to serve as an analytical tool enabling appraisers to weigh, distinguish, differentiate, and reconcile lease terms, step-up provisions, and other financial concessions under comparable leases, to assist the appraiser in developing a credible economic or market rent. This analysis pays deference to the principal that under the income capitalization approach, the present value must account for the future economic benefits to be received by the property owner over the anticipated lease term.

Accordingly, when undertaking an "effective" rent analysis, the valuation expert's investigation must include: (i) an in-depth scrutiny of the comparable and competitive leases in the marketplace; (ii) data regarding the typical term of those leases to gauge the anticipated length of the income flow; (iii) what, if any, step-up rent is payable under the leases; (iv) an analysis of whether the step-up rent accurately reflects market or economic rent; and (v) what are typical and atypical financial or rent concessions in the marketplace.

Here, in arriving at his calculation of "effective" rent, OTR-MCC/Brookwood's expert limited his consideration to the rent payable only during the first five years of each lease, without consideration as to what the market dictated was the average length of Class A office leases in the Parsippany-Troy Hills submarket. Moreover, OTR-MCC/Brookwood's expert testified that "what I'm trying to do is identify what's an <u>initial effective rent</u>, . . ." However, ascertaining the "initial effective rent" and arbitrarily limiting the analysis to only the first five years of rent payable without consideration of what the marketplace dictates is the reasonable term of a Class A office lease, fails to adequately consider the anticipated revenue and the reasonable expectations of property owners of Class A office buildings in the Parsippany-Troy Hills submarket. In sum,

OTR-MCC/Brookwood's expert offered no evidence either during trial or in his appraisal reports that the five-year period he utilized represented a benchmark for Class A office leases in the Parsippany-Troy Hills submarket.

To the contrary, OTR-MCC/Brookwood's expert acknowledged that "[a] lot of these [comparable] leases went beyond five years but it's not proper to go too far into the future with averaging a rent." Significantly however, OTR-MCC/Brookwood's expert later expressed that for purposes of amortizing his tenant improvement allowance, a seven-year lease term should be applied because, in his opinion, seven years represented the typical length of Class A office leases in the northern New Jersey marketplace. Thus, despite opining that the typical length of a Class A office lease in the marketplace was seven years, OTR-MCC/Brookwood's expert elected to apply an indiscriminate five-year period in calculating his "effective" rent. Accordingly, the court finds OTR-MCC/Brookwood's expert's consideration of only the first five years under each subject property lease and comparable lease for purposes of his "effective" rent calculation to be arbitrary, not appropriately derived from the marketplace, and unreliable.

Similarly, the court finds Parsippany's expert's method of calculating the "effective" rent by averaging the rent over the entire lease term also unreliable. Parsippany's expert seemingly gave no consideration to whether the proffered lease terms exceeded marketplace norms, offering no analysis of what the typical length of a Class A office lease was in the Parsippany-Troy Hills submarket during the periods at issue. Thus, the court questions whether the rent step-ups contained under those leases accurately reflected economic or market rent, or merely represented the property owner's best guess of what economic or market rent may be fifteen or twenty years into the future. Averaging the rent payable in the twentieth year of a lease with the rent payable in the first year of a lease without consideration to whether the length of that lease is atypical in

the marketplace, will produce an inaccurate representation of the future return that a property owner reasonably anticipates from their investment. Accordingly, the court finds Parsippany's expert's formula for calculating "effective" rent over the entire term of the subject property leases and comparable leases unreliable.

Rather, the court finds that the calculation of "effective" rent must be harmonious and co-exist with the appraisers' review and analysis of data in the marketplace. For example, if the marketplace data discloses that Class A building property owners reasonably anticipate an income stream to be generated from their leases over ten years, with rent concessions and tenant improvement allowances amortized over that same ten-year period, then the "effective" rent calculation should account for the rent step-ups and financial or rent concessions afforded over the ten-year lease term. However, if the analysis of the marketplace data discloses that Class A building property owners reasonably anticipate a ten-year income stream, but the proposed comparable lease is for a term of twenty years, then averaging the rent over only the first five years or averaging the rent over the entire twenty-year term will artificially inflate or deflate the "effective" rent and, correspondingly, the concluded economic or market rent ascribed thereto.

The court agrees with OTR-MCC/Brookwood's expert's conclusion that "you wouldn't want to average a rent over a long period of time," because that would afford equal weight to the rent payable during the first month of the lease as it would to rent payable in the one-hundred-and-eightieth month under the lease. However, for substantially the same reasons that is why the calculation of "effective" rent must not be arbitrarily or blindly applied. The court finds that the calculation of "effective" rent herein should not be manipulated or affected by the appraisers' artificial application of limited evaluation periods, or the selection of leases that are predominantly shorter or longer than the average term of Class A office leases in the marketplace. Rather, the

court concludes that the calculation of "effective" rent must be harmonious with the appraisers'
analysis of the marketplace data and what the reasonable expectations of Class A property owners
are in the Parsippany-Troy Hills submarket.

Here, the court's review of OTR-MCC/Brookwood's expert's forty-seven subject property
leases and fifty comparable leases demonstrated the following average lease term:

|  | 2009 | 2010 | 2011 to 2013 | 2014 to 2016 | 2017 to 2019 |
|---|---|---|---|---|---|
| Subject property leases | 74 months | 79.92 months | 65.33 months | 82.5 months | 76.5 months |
| Comparable leases | 101 months | 88.5 months | 98.57 months | 71.29 months | 110.4 months |

Moreover, the court's review of Parsippany's expert's six subject property leases and seven
comparable leases revealed an average lease term of 104.31 months.

The foregoing data demonstrates to the court that owners of Class A office buildings in the
Parsippany-Troy Hills office submarket reasonably anticipated an income stream and amortization
of financial concessions under their leases ranging from 65.33 months (6 years, 3 months) to
110.40 months (9 years, 4 months), or between one to four years longer than the five-year formula
applied by OTR-MCC/Brookwood's expert in calculating his "effective" rent.

Accordingly, the court finds that during all tax years at issue, property owners of Class A
office buildings in the Parsippany-Troy Hills submarket reasonably anticipated an eight-year
revenue stream and, correspondingly, would include rent step-ups and amortize financial/rent
concessions, over the same eight-year time-period. Therefore, the court finds that the market data
and evidence demonstrate that in calculating the "effective" rent, an eight-year period should be
employed.

However, because the trial record does not contain evidence of the step-up rent payable
under OTR-MCC/Brookwood's expert's comparable office leases, the court is unable to determine
the "effective" rent under those leases based on an eight-year calculation period. Moreover, the

court finds Parsippany's expert's seven comparable office leases to be unreliable.[24] Therefore, the court excludes from consideration OTR-MCC/Brookwood's expert's fifty non-subject property comparable leases and Parsippany's expert's seven non-subject property comparable leases in determining the subject property's economic or market rent.

Importantly, the court finds credible Parsippany's expert's conclusion that the subject property's leases offer the best indication and evidence of the subject property's economic or market rent for all tax years at issue. Here, OTR-MCC/Brookwood's expert identified forty-seven subject property new and renewal leases executed between 2006 and 2018. In addition, Parsippany's expert identified six subject property new and renewal leases entered between 2008 and 2018.

Therefore, the court finds that an abundance of credible market data exists in the trial record enabling the court to calculate the "effective" rent of the subject property leases over an eight-year period, and to arrive at a determination of the subject property's economic or market rent. The court further emphasizes that consideration of only the subject property leases alleviates the need

---

[24] Parsippany's expert's Improved Lease No. 1 charged flat rent of $25.21 per square foot over the lease term and Improved Lease No. 5 charged flat rent of $36.76 per square foot over the lease term. However, Parsippany's expert admitted during cross-examination that he failed to consider the impact of either below-market or above-market tenant improvement allowances. Because the court has no information regarding the tenant improvement allowances for these properties, the court accords no weight to their rents in discerning the subject property's economic or market rent. In addition, Parsippany's expert's Improved Lease No. 2, Improved Lease No. 10 and Improved Lease No. 11 were "Net" and "Gross" lease arrangements, requiring adjustments to account for the different lease types. However, effective cross-examination disclosed that with respect to Improved Lease No. 10, Parsippany's expert's adjustments did not accurately account for differences between a modified gross lease and net lease. Moreover, effective cross-examination further disclosed that with respect to Improved Lease No. 11, the tenant was responsible for certain operating costs, shell rent, and tenant improvement rent, not accounted for by Parsippany's expert. Accordingly, the court accords no weight to Parsippany's expert's Improved Lease No. 10 and Improved Lease No. 11 in discerning the subject property's economic or market rent.

to attempt to quantify and apply adjustments to account for differing lease types, varying lease terms, or economic conditions that may or may not have played a role in the rents payable thereunder.

The court's review and analysis of the "effective" rent of the subject property's forty-seven new and renewal leases, based on an average eight-year term, disclosed the following:[25] (i) for the 2009 and 2010 tax years, the "effective" rent for the thirteen leases, including financial/rent concessions, ranged from $26.00 to $32.00 per square foot, with a mean of $28.16;[26] (ii) for the 2011, 2012, and 2013 tax years, the "effective" rent for the twelve leases, including financial/rent concessions, ranged from $21.53 to $28.75 per square foot, with a mean of $26.16;[27] (iii) for the 2014, 2015, and 2016 tax years, the "effective" rent for the eleven leases, including financial/rent concessions, ranged from $25.72 to $29.71 per square foot, with a mean of $27.25;[28] and (iv) for the 2017, 2018, and 2019 tax years, the "effective" rent for the eleven leases, including financial/rent concessions, ranged from $26.10 to $28.74 per square foot, with a mean of $26.75.[29] The court highlights that the subject property's leases experienced the steepest decline in rental rates in 2011, 2012, and 2013. However, as credibly testified by Parsippany's expert, vacancy rates began to subside and the subject property's economic or market rents began to experience a rebound with the improving economy.

Accordingly, the court finds that the subject property should be ascribed a market or

---

[25] To calculate the "effective" rent on the eight-year average lease term, the court reviewed OTR-MCC/Brookwood's expert's appraisal reports (Leased Status of Property) and the addendum thereto containing the subject property rent rolls. In addition, the court reviewed the addendum to Parsippany's expert's appraisal report containing the subject property's rent rolls.
[26] Leases executed between 9/1/2006 to 11/24/2008.
[27] Leases executed between 12/17/2009 to 1/1/2012.
[28] Leases executed between 2/15/2013 to 9/1/2015.
[29] Leases executed between 1/1/2017 to 12/1/2018.

economic rent of: (i) $28.00 for the 2009 and 2010 tax years; (ii) $26.25 for the 2011, 2012, and 2013 tax years; (iii) $27.25 for the 2014, 2015, and 2016 tax years; and (iv) $27.00 for the 2017, 2018, and 2019 tax years.

B.    Tenant electricity

The subject property is leased on a modified gross basis, plus tenant electric basis. Thus, OTR-MCC/Brookwood is responsible for the operating expenses of the subject property except for tenant electric. Each tenant pays or reimburses OTR-MCC/Brookwood for their electricity expenses on a per square foot basis.

Here, the experts agreed that the market rate of reimbursed tenant electricity was $1.50 per square foot for all tax years. However, they applied the reimbursed tenant electricity on their reconstructed operating statements in different manners.

OTR-MCC/Brookwood's expert deducted $1.50 per square foot from his concluded stabilized utility expense to account for the offsetting tenant reimbursed electricity that would be paid to the property owner. For example, if the stabilized utility expense for the subject property was $3.00 per square foot, OTR-MCC/Brookwood's expert deducted reimbursed tenant electricity of $1.50 per square foot to arrive at a net stabilized utility expense of $1.50 per square foot ($3.00 - $1.50 = $1.50 net stabilized utility expense). Conversely, Parsippany's expert added $1.50 per square foot of tenant reimbursed electricity income in deriving the subject property's potential gross income. Accordingly, Parsippany's expert made no adjustment to his stabilized utility expense to account for the reimbursed tenant electricity.

The court's research discloses that both methods of characterizing tenant reimbursed electricity are appropriate, and that the choice of approach is purely stylistic. Accordingly, for purposes of simplicity and clarity in generating the reconstructed operating statements, the court

will deduct from its concluded stabilized utility expense the reimbursed tenant electricity of $1.50 per square foot, thereby producing a net stabilized utility expense.

C.    Vacancy and Collection Loss

In arriving at his vacancy and collection loss rates, OTR-MCC/Brookwood's expert consulted REIS Office Market Reports publications, reviewed the subject property's vacancy rates, surveyed vacancy rates from a "Peer Group" of office buildings in the Parsippany-Troy Hills submarket he assembled, and reviewed CoStar office reports.

First, OTR-MCC/Brookwood's expert reviewed the REIS Office Market Reports which revealed that absorption was negative in 2009, 2010, 2012, 2016, and 2017, reflecting a declining market, but positive in 2011, 2013, 2015, and 2018, reflecting an improving market. According to OTR-MCC/Brookwood's expert, the REIS Office Market Reports further revealed vacancy rates for Class A office buildings in the Parsippany-Troy Hills submarket ranged from 17.11% to 30.03% during the tax years at issue.

Next, OTR-MCC/Brookwood's expert reviewed the subject property's vacancy rates, concluding that the subject property experienced vacancy rates between 17.96% to 36.10%, with an average of 27.37%, from 2007 to 2018. In OTR-MCC/Brookwood's expert's opinion, the subject property has experienced "unusually high vacancy" rates in the market.

OTR-MCC/Brookwood's expert then identified a "Peer Group (Competitive Set)" of thirty-one Class A multi-tenanted office buildings in the Parsippany-Troy Hills office submarket. According to OTR-MCC/Brookwood's expert, those buildings reported vacancy rates averaging: (i) 21.70% for the 2009 tax year; (ii) 25% for the 2010 tax year; (iii) 23.2% for the 2011 tax year; (iv) 23.6% for the 2012 tax year; (v) 23.2% for the 2013 tax year; (vi) 26.7% for the 2014 tax year; (vii) 26.4% for the 2015 tax year; (viii) 25% for the 2016 tax year; (ix) 28.95% for the 2017 tax

year; (x) 32.91% for the 2018 tax year; and (xi) 28.47% for the 2019 tax year.

In arriving at his vacancy and collection loss rates, OTR-MCC/Brookwood's expert particularly focused on the vacancy rates of eight office buildings in the Morris Corporate Center, adjacent to the subject property, including Morris Corporate Center III (400 Interpace Parkway, Buildings A, B, C, & D) and Morris Corporate Center IV (369-379-389-399 Interpace Parkway). The vacancy rates for those eight buildings ranged from: (i) 0% to 88.20%, with a median of 32.4% and mean of 39.34%, for the 2009 tax year; (ii) 0% to 90.3%, with a median of 30.9% and mean of 42.4%, for the 2010 tax year; (iii) 0% to 90.3%, with a median of 26.5% and mean of 39.2%, for the 2011 tax year; (iv) 0% to 86.5%, with a median of 24.3% and mean of 38.6%, for the 2012 tax year; (v) 0% to 86.5%, with a median of 24.3% and mean of 38.6%, for the 2013 tax year; (vi) 0% to 95.1%, with a median of 18.65% and mean of 38.5%, for the 2014 tax year; (vii) 0% to 95.1%, with a median of 13.8% and mean of 35.1%, for the 2015 tax year; (viii) 0% to 100%, with a median of 22.9% and mean of 36.91%, for the 2017 tax year; (ix) 0% to 100%, with a median of 42.4% and mean of 47.36%, for the 2018 tax year; and (x) 0% to 100%, with a median of 12.4% and mean of 31.89%, for the 2019 tax year.[30]

Finally, OTR-MCC/Brookwood's expert testified that he also considered CoStar office reports for the Parsippany-Troy Hills office submarket which includes Boonton, Cedar Knolls, Lake Hiawatha, Montville, Morris Plains, Mountain Lakes, Parsippany, Pine Brook, Towaco, and Whippany. According to OTR-MCC/Brookwood's expert, the CoStar office reports revealed vacancy rates for all building classes of 14.6% to 25.9% during the tax years at issue.

---

[30] Although OTR-MCC/Brookwood's expert's report (Exhibits P-1(b) and P-3) state that the "Peer Group (Competitive Set)" is for the "2010-2016 Tax Years," he included only six years of data (3rd Quarters 2009 to 2014) and did not include the 3rd Quarter 2015 data, which would encompass the 2016 tax year.

In OTR-MCC/Brookwood's expert's opinion, the Parsippany-Troy Hills office submarket was "weak" during all tax years at issue. Therefore, he concluded that a vacancy and collection loss allowance of 25% should be applied to the subject property's potential gross income for the 2009, 2010, 2011, 2012, 2013, 2014, 2015, and 2016 tax years; and a vacancy allowance of 30% should be applied to the subject property's potential gross income for the 2017, 2018, and 2019 tax years.

Similarly, in arriving at his vacancy and collection loss rates, Parsippany's expert assembled and analyzed two CoStar building vacancy reports, reviewed the subject property's rent rolls and "operational history," including its reported vacancy rates, and consulted Cushman & Wakefield's Marketbeat Northern New Jersey Office reports.

Parsippany's expert's first CoStar building vacancy report examined what he termed as the "gross inventory" in the Parsippany-Troy Hills office submarket during each tax year. This report comprised 394 to 409 office buildings in the Parsippany-Troy Hills submarket, composed of all office building classes, and 19,974,530 to 21,749,067 square feet of office space. According to Parsippany's expert, this report revealed vacancy rates for all office building classes ranged from 15.7% to 22.5% during the tax years at issue.

In Parsippany's expert's opinion, "structural changes in the economy" were being experienced due to the 2008 recession, resulting in a conspicuous increase in office building availability and vacancy rates from 2009 to 2013. However, according to Parsippany's expert, office building availability and vacancy rates peaked by mid-year 2013 and, as market conditions improved, there was a pronounced decline in vacancy rates in the ensuing years because "the market was adjusting."

Parsippany's expert's second CoStar building vacancy report examined the vacancy rates

of between 282 to 290 office buildings located within a 3-mile radius of the subject property, including Parsippany, Morris Plains, portions of Denville, and Mountain Lakes. This report again included all office building classes and comprised between 16,322,739 to 17,206,063 square feet of office space. In Parsippany's expert's opinion, the 3-mile radius represents the geographical boundaries that a prospective tenant will select in attempting to locate a suitable property. According to Parsippany's expert, the second CoStar report revealed vacancy rates within a 3-mile radius of the subject property ranging from 17.4% to 22.7% during the tax years at issue.

Additionally, Parsippany's expert review of the subject property's rent rolls and "operational history" disclosed that the subject property experienced vacancy rates ranging from 16.97% to 36.10%, and averaging 25.47%, from 2008 to 2018.

Finally, Parsippany's expert consulted and analyzed Cushman & Wakefield's Marketbeat Northern New Jersey Office reports. His review of that publication disclosed that of the approximately 12,187,171 to 13,011,532 square feet of office space in the Parsippany-Troy Hills submarket surveyed by Cushman & Wakefield, the direct vacancy rates ranged from 15.6% to 23.9%, and the overall vacancy rates ranged from 20.8% to 28.1% for all office building classes for the 2010 to 2018 tax years.[31]

Accordingly, in Parsippany's expert's opinion, a vacancy and collection loss allowance of 15% should be applied to the subject property's potential gross income for all tax years at issue.

The court recognizes that OTR-MCC/Brookwood's expert concluded that the eight Class A buildings comprising the Morris Corporate Center office park offered the most meaningful

---

[31] According to Parsippany's expert, the direct vacancy rate represents office space that was physically vacant and available for lease, and the overall vacancy rate represents occupied office space being marketed for lease at later time.

insight on the issue of the subject property's vacancy and collection loss. However, the court emphasizes that its own review of that data discloses notable anomalies exist, resulting in great variation between the reported vacancy rates for those eight buildings, from 0% to 100%, during the tax years at issue. For example, Morris Corporate Center III - Building A, comprising 114,984 square feet, experienced a vacancy rate of approximately 89% for the 2009, 2010, and 2011 tax years, but thereafter experienced a 0% vacancy rate for the 2012, 2013, 2014, 2015, 2017, 2018, and 2019 tax years. Similarly, the data reveals that Morris Corporate Center III - Building B, comprising 151,950 square feet, experienced a vacancy rate of 0% for the 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2017, and 2019 tax years, however reported a 79.8% vacancy rate for the 2018 tax year. Moreover, Morris Corporate Center IV – 369 Interpace Parkway, comprising 188,021 square feet, reported vacancy rates of 76.9% to 100% during all tax years at issue. These wide disparities may be attributable to what Parsippany's expert explained was the loss of their "target market" tenants, a single, large-scale user of the property. However, these wide variations and inconsistencies may also be attributable to other factors such as the disparate ages of the buildings, the condition of the buildings, or the quality of the management.[32] Without an adequate understanding of what role, if any, these factors played in the vacancy rates of the other office buildings in the Morris Corporate Center campus, the court cannot say that their vacancy rates offer meaningful evidence of the subject property's vacancy and collection loss rates.

Accordingly, after thoroughly considering the experts' testimony and reviewing the data presented, the court concludes that the following stabilized vacancy and collection loss allowances

---

[32] According to OTR-MCC/Brookwood's expert, the subject property was constructed in 1986 and Morris Corporate Center III, Buildings A, B, C, and D were constructed in 1990, four years after the subject property. Conversely, construction of Morris Corporate Center IV was completed in 1999 and 2000, approximately thirteen to fourteen years after the subject property.

should be applied: (i) eighteen (18%) percent, for the 2009 and 2010 tax years; (ii) twenty-two (22%) percent, for the 2011, 2012, 2013, 2014, 2015, and 2016 tax years; and (iii) twenty percent (20%), for the 2017, 2018, and 2019 tax years. The court finds that the foregoing vacancy and collection loss rates recognize, as Parsippany's expert credibly testified, the impact of the 2008 recession and the "structural changes" being experienced in the Parsippany-Troy Hills office submarket. As office leases expired in 2009, 2010, and 2011, more and more of those spaces often became vacant, correspondingly causing economic and market rents to decline. As our country emerged from the recession, vacancy rates began to decline, and economic and market rents began to rise. As the graph contained in Parsippany's expert's appraisal report demonstrates, vacancy rates in the Parsippany-Troy Hills submarket saw their most pronounced increased from 2010 into 2011, peaking in mid-2013 before slowly declining and plateauing in late 2016.

### D. Stabilized expenses

Once economic or market rent, potential gross income, tenant reimbursed electricity, and the vacancy and collection loss rates have been determined, the next step under the income capitalization approach is discerning the stabilized expenses to be deducted from the effective gross income.

OTR-MCC/Brookwoo d's expert and Parsippany's expert agreed that a stabilized leasing commission expense of 5% of effective gross income was appropriate. The court finds the experts' opinions that a leasing commission expense of 5% of effective gross income is reasonable and supported by the evidence.

### 1. OTR-MCC/Brookwood's expert

To determine the stabilized operating expenses to be applied to the subject property's effective gross income, OTR-MCC/Brookwood's expert reviewed the subject property's historical

operating expenses, building expense data from several comparable office buildings located throughout northern New Jersey,[33] and industry publications (Building Owners and Managers Association).[34]

According to OTR-MCC/Brookwood's expert, the subject property experienced: (i) insurance expenses of $0.12 to $0.31 per square foot; (ii) utility expenses (net) of $0.00 to $1.54 per square foot; (iii) repair and maintenance expenses of $2.22 to $3.79 per square foot; (iv) cleaning and janitorial expenses of $0.77 to $1.46 per square foot; and (v) general/administrative expenses of $0.02 to $0.87 per square foot, during all tax years at issue.

Moreover, OTR-MCC/Brookwood's expert's review of the comparable northern New Jersey office buildings disclosed: (i) insurance expenses from $0.10 to $0.55 per square foot; (ii) utility expenses (net) of $0.58 to $3.22 per square foot; (iii) repair and maintenance expenses of $1.57 to $3.83 per square foot; (iv) cleaning and janitorial expenses of $0.77 to $1.99 per square foot; and (v) general/administrative expenses of $0.00 to $1.29 per square foot, during all tax years at issue.

Further, OTR-MCC/Brookwood's expert's review of BOMA's Experience Exchange Report for the Morristown, New Jersey market disclosed: (i) insurance expenses averaged $0.17 to $0.42 per square foot; (ii) utility expenses (gross) averaged $1.47 to $2.77 per square foot; (iii) repair and maintenance expenses averaged $2.17 to $3.68 per square foot; (iv) cleaning and janitorial expenses averaged $1.07 to $1.85 per square foot; and (v) general/administrative

---

[33] Approximately twenty-five to twenty-six office buildings.

[34] The court highlights that although OTR-MCC/Brookwood's expert's appraisal reports summarized what he opined were the average and median expenses reported each year under the BOMA reports, the BOMA reports included in the addendum to the appraisal reports were illegible. Therefore, the court was unable to independently verify the accuracy and integrity of the reported information.

expenses averaged $0.66 to $1.32 per square foot, during all tax years at issue.

After reviewing the foregoing data, OTR-MCC/Brookwood's expert concluded that the following stabilized expenses should be applied: (i) a general administrative fee of $0.50 per square foot; (ii) a management fee of 3% of effective gross income; (iii) a utility expense (net) of $1.00 to $1.50 per square foot; (iv) structural/replacement reserves of 1% of effective gross income; (v) insurance expenses of $0.25 to $0.30 per square foot; (vi) repair and maintenance expenses of $2.75 to $3.00 per square foot; and (vii) cleaning/janitorial expenses of $1.15 to $1.30 per square foot, during the tax years at issue.

### 2. Parsippany's expert

To determine his stabilized operating expenses, Parsippany's expert similarly reviewed the subject property's historical operating expenses and building expense data from three Class A office buildings within the Parsippany-Troy Hills submarket.

According to Parsippany's expert, the subject property experienced: (i) insurance expenses of $0.00 to $0.31 per square foot; (ii) utility expenses (gross) of $0.00 to $4.41 per square foot; (iii) repair and maintenance expenses of $1.65 to $8.09 per square foot; (iv) management expenses of $0.00 to $0.38 per square foot; and (v) general/administrative expenses of $0.03 to $1.21 per square foot, during all tax years at issue. In Parsippany's expert's opinion, the cleaning and janitorial expense should be included under the repair and maintenance category.

Moreover, Parsippany's expert's review of the operating expenses of the three Class A office buildings in the Parsippany-Troy Hills submarket disclosed: (i) insurance expenses from $0.23 to $0.42 per square foot; (ii) utility expenses (gross) of $2.45 to $3.82 per square foot; (iii) repair and maintenance expenses (gross) of $2.48 to $4.07 per square foot; (iv)

general/administrative expenses (including professional fees) of $0.59 to $0.82 per square foot;[35]

and (v) management fee expenses of $0.38 to $0.92 per square foot, during all tax years at issue.

After reviewing the foregoing data, Parsippany's expert concluded that: (i) an administration/management fee of 5% of effective gross income; (ii) utility expenses (gross) of $3.00 per square foot; (iii) structural/replacement reserves of $0.35 per square foot; (iv) insurance expenses of $0.20 per square foot; and (v) repair and maintenance expenses of $2.50 per square foot should be applied to the subject property's effective gross income, during all tax years at issue.

### 3. Court's analysis

After considering the experts' testimony and the evidence presented in these matters, and analyzing the subject property's historical operating expenses, the court finds that the following stabilized expenses should be attributable to the subject property: (i) an insurance expense of $0.21 per square foot; (ii) utility expenses (net of tenant reimbursed electricity) of $1.50 per square foot; (iii) cleaning and janitorial expenses of $1.25 per square foot; (iv) repair and maintenance expenses of $2.25 per square foot; (v) management and general administrative expenses of 5% of effective gross income; and (vi) replacement reserves of 1% of effective gross income, during all tax years.

Here, the evidence disclosed that the subject property has traditionally incurred insurance expenses ranging from $0.13 to $0.31 during the tax years at issue, with an average insurance expense of approximately $0.21 per square foot. Moreover, the court's examination of the insurance expenses of the comparable buildings within the Parsippany-Troy Hills and Morris County office market identified by OTR-MCC/Brookwood's expert, disclose an insurance expense range of $0.13 to $0.41, with an average of $0.22. Accordingly, the court finds that a

---

[35] No general/administrative expenses were reported for Parsippany's expert's comparable office building at 7 Century Drive, Parsippany, New Jersey.

stabilized insurance expense of $0.21 per square foot is reasonable and supported by the market data.

The court highlights that the experts' restatement of the subject property's historical utility expenses (net of tenant reimbursed electricity) is disparate. According to OTR-MCC/Brookwood's expert, the utility expenses (net of tenant reimbursed electricity) ranged from $0.02 to $1.54 during the tax years at issue, with an average of approximately $0.64 per square foot. Conversely, Parsippany's expert expressed that the utility expenses (net of tenant reimbursed electricity) ranged from $0.21 to $2.91 during the tax years at issue, with an average of approximately $1.87 per square foot. Because the court cannot accurately reconcile these disparities, the court places no weight on the subject property's historical utility expenses. Rather, the court places the greatest weight and emphasis on the utility expenses of the comparable office buildings in the Parsippany-Troy Hills and Morris County office markets that were identified by the experts. The court's review of the data offered by OTR-MCC/Brookwood's expert discloses a utility expense range (net of $1.50 tenant reimbursed electricity) of $0.58 to $2.12, with an average of $1.30. Moreover, the court's review of the data from Parsippany's expert reveals a utility expense range (net of $1.50 tenant reimbursed electricity) of $0.95 to $2.32, with an average of approximately $1.40 per square foot. Moreover, the court's review of the BOMA national data (averaging all tax years at issue), disclosed an average utility expense of $2.04. Accordingly, the court finds that a stabilized utility expense of $1.50 per square foot (net of $1.50 tenant reimbursed electricity), for all tax years at issue, is reasonable and supported by the market data.

The principal difference between the experts' opinions and calculations of the stabilized repair and maintenance expenses and cleaning and janitorial expenses centers around whether cleaning and janitorial expenses should be included or excluded from the repair and maintenance

expenses. In OTR-MCC/Brookwood's expert's opinion, the cleaning and janitorial expenses should be segregated from the repair and maintenance expenses and afforded its own expense category on the reconstructed operating statement. Conversely, in Parsippany's expert's opinion, the stabilized repair and maintenance expenses include "all repairs and maintenance, annual service contracts, [and] ground care costs" associated with the property. Thus, he concluded that cleaning and janitorial services do not need to be afforded a separate stabilized entry on the reconstructed operating statements.

Although the court recognizes that cleaning and janitorial expenses may constitute a subcategory of the larger repair and maintenance expenses category, the court could not identify any legal precedent or standard that requires cleaning and janitorial services be included or excluded from the repair and maintenance expenses category. Rather, the inclusion of cleaning and janitorial expenses under the repair and maintenance expenses category, or the itemization of cleaning and janitorial expenses as a separate expense line item, is purely stylistic. However, the court emphasizes that when cleaning and janitorial expenses are to be itemized separately from repair and maintenance expenses, it is imperative that the appraiser have knowledge about whether the reported repair and maintenance expenses include or exclude the cleaning and janitorial expenses, to ensure that a proper comparison is made between the comparable properties and published market data.

Here, the court's review of the subject property's historical income and expense statements, contained in the addendum to OTR-MCC/Brookwood's expert's appraisal reports (pages 60 to 106), reveals that the subject property has segregated and historically incurred unreimbursed cleaning and janitorial expenses. Those cleaning and janitorial expenses ranged from $1.02 to $1.46 during the 2008 to 2013 tax years, with an average of approximately $1.27 per square foot;

and ranged from $0.77 to $1.47 during the 2014 to 2018 tax years, with an average of approximately $1.18 per square foot. Moreover, the court's examination of the cleaning and janitorial expenses of the comparable office buildings in the Parsippany-Troy Hills and Morris County office market identified by OTR-MCC/Brookwood's expert disclosed a cleaning and janitorial expense range of $0.65 to $2.03 per square foot, with an average of $1.33 per square foot.

After reviewing the foregoing information offered by OTR-MCC/Brookwood's expert and Parsippany's expert, the court finds that market data supports the conclusion that a stabilized cleaning and janitorial expense of $1.25 per square foot is reasonable and should be applied for all tax years under appeal.

Turning to the larger category of repair and maintenance expenses, the court's review of the expense statements for the three comparable Parsippany-Troy Hills office buildings identified by Parsippany's expert demonstrates maintenance and repair expenses (net of a $1.25 cleaning and janitorial expense) ranged from $1.23 to $2.82 per square foot, with an average of $1.73 per square foot.[36] Conversely, the court's review of OTR-MCC/Brookwood's expert's comparable office buildings in the Parsippany and Morris County markets demonstrates that maintenance and repair expenses ranged from $1.78 to $4.10 per square foot, with an average of $2.57 per square foot.[37] Accordingly, the court finds that a stabilized repair and maintenance expense (net of $1.25 cleaning

---

[36] Because Parsippany's expert classified cleaning and janitorial expenses as part of repair and maintenance expenses, it was necessary for the court to deduct from Parsippany's expert's proffered repair and maintenance expenses the court's concluded $1.25 cleaning and janitorial expenses.

[37] The court highlights that excluding the 200 Kimball Drive, Parsippany comparable property, whose expenses generally were the highest of those within the Morris County market surveyed by OTR-MCC/Brookwood's expert, the average repair and maintenance expenses were $2.35 per square foot.

and janitorial expenses) of $2.25 per square foot is reasonable and supported by the market data for all tax years.

The principal difference between the experts' opinion and calculation of management fees centers around whether general and administrative expenses should be included in the management fee or segregated from the management fee. In OTR-MCC/Brookwood's expert's opinion, general and administrative expenses are separate and distinct from management fees and should be afforded a separate stabilized expense deduction. Accordingly, OTR-MCC/Brookwood's expert stabilized general and administrative expenses at $0.50 per square foot and stabilized management fees at 3% of effective gross income. Conversely, in Parsippany's expert's opinion, general and administrative expenses should be included as a subcategory of the management expenses. Accordingly, Parsippany's expert deducted management expenses of 5% of effective gross income.

OTR-MCC/Brookwood's expert provided management expenses from several other properties in northern New Jersey. The court's review of the management expenses of the office buildings within the Parsippany-Troy Hills and Morris County markets disclose a range of management expenses of 2.33% to 3.13%, with an average management expense of 2.95% of effective gross income, excluding administrative expenses. Conversely, Parsippany's expert offered evidence of management fees from three multi-tenanted Class A buildings in the Parsippany-Troy Hills submarket disclosing management/administrative/other expenses ranging from $0.95 to $1.36 per square foot, with an average management/administrative/other expense of approximately $1.10 per square foot.

Here, the court finds Parsippany's expert's testimony more credible and reasonable on the issue, that general and administrative costs are incurred and associated with the management and

operation of a Class A multi-tenanted office building in the Parsippany-Troy Hills submarket. Therefore, they should be encompassed in the stabilized management expenses of the subject property. Accordingly, the court will apply a stabilized management expense of 5% of the effective gross income and will not separately itemize a general and administrative expense.

Finally, OTR-MCC/Brookwood's expert stabilized replacement reserves at 1% of effective gross income, or, based on his calculated effective gross income, approximately $0.18 to $0.20 per square foot. Conversely, Parsippany's expert stabilized replacement reserves at $0.35 per square foot, or approximately 1.35% to 1.4% of his calculated effective gross income. The court finds OTR-MCC/Brookwood's testimony more reasonable and credible on this issue. Accordingly, the court will apply a stabilized replacement reserve expense of 1% of effective gross income.

E.   Tenant improvement allowance

"In certain real estate markets, space is rented to a new tenant only after substantial interior improvements are made." Hull Junction Holding Corp., 16 N.J. Tax at 106 (quoting Appraisal Institute, The Appraisal of Real Estate, 450 (10th ed. 1992)). When these improvements are incurred at the landlord's expense and are necessary to realize market rent, they are referred to as tenant improvement allowances. The cost of the tenant improvement allowance is often built into the rental rate and amortized by the landlord over the lease term. The Appraisal of Real Estate, at 474 (14th ed. 2013).

In the opinion of both experts, tenant improvement allowances are an annually reoccurring expense for owners of Class A multi-tenanted office buildings in the Parsippany-Troy Hills submarket. Accordingly, each expert calculated a stabilized tenant improvement allowance and deducted such amount from the subject property's effective gross income.

To compute his tenant improvement allowance, OTR-MCC/Brookwood's expert examined

the subject property's new and renewal leases; new and renewal leases for ten comparable

properties for the 2009 tax year; new and renewal lease for twenty comparable properties for the

2010 to 2016 tax years; and new and renewal leases for twenty comparable properties for the 2017

to 2019 tax years; market participant surveys; and survey data promulgated by PwC of the National

Suburban Office Market.

Significantly, after analyzing the subject property leases and comparable leases, OTR-

MCC/Brookwood's expert opined that Class A offices in the Parsippany-Troy Hills submarket

lease for a "typical 84-month term."[38]  Thus, OTR-MCC/Brookwood's expert concluded that a

seven-year amortization term should be applied in computing the tenant improvement allowance.

OTR-MCC/Brookwood's expert's examination disclosed the following range of tenant

improvement allowances in the marketplace:

| Tax years | Lease type | Subject property | Comparable properties | Market participants | Korpacz/PwC |
|---|---|---|---|---|---|
| 2009 | New leases | $1.00 to $34.14, $12.68 avg. | $15.00 to $36.55, $24.57 avg. | $20.00 to $30.00 | $0.00 to $50.00, $22.98 avg. |
| | Renewal leases | $9.54 to $16.00, $12.68 avg. | $25.00 to $30.00, $23.13 avg. | $0.00 to $10.00 | $0.00 to $20.00, $8.50 avg. |
| 2010-2016 | New leases | $1.00 to $45.13, $25.06 avg. | $20.00 to $66.78, $34.38 avg. | $20.00 to $30.00 | $0.00 to $80.00, $28.93 to $31.96 avg. |
| | Renewal leases | $0.00 to $45.00, $10.93 avg. | $1.93 to $20.00, $10.66 avg. | $0.00 to $10.00 | $0.00 to $25.00, $11.86 to $13.93 avg. |
| 2017-2019 | New leases | $5.00 to $55.00, $35.58 avg. | $25.00 to $70.16, $46.53 avg. | $30.00 to $50.00 | $0.00 to $100.00, $31.25 to $39.58 avg. |
| | Renewal leases | $5.00 to $50.00, $17.85 avg. | $6.11 to $15.00, $11.07 avg. | $10.00 to $20.00 | $0.00 to $40.00, $13.57 to $17.92 avg. |

After reviewing the above information, OTR-MCC/Brookwood's expert concluded the

following tenant improvement allowances: (i) $30.00 per square foot for new leases and $10.00

---

[38]  For the 2009 tax year, the comparable new leases average term were 103 months; and the comparable renewal leases average term were 97 months.  For the 2010 to 2016 tax years, the comparable new leases average term were 89 months; and the comparable renewal leases average term were 67 months.  For the 2017 to 2019 tax years, the comparable new leases average term were 120 months; and the comparable renewal leases average term were 67 months.

per square foot for renewal leases for the 2009 to 2016 tax years; and (ii) $35.00 per square foot

for new leases and $15.00 per square foot for renewal leases for the 2017 to 2019 tax years.

Next, because a combination of new and existing tenants each receive improvement

allowances, OTR-MCC/Brookwood's expert endeavored to ascertain the probability of lease

renewals in the marketplace.  He examined PwC surveys of the National Suburban Office Market

disclosing a renewal probability range of: (i) 65% to 75% for the 2009 tax year; (ii) 50% to 70%

for the 2010 tax year; (iii) 50% to 75% for the 2011 to 2016 tax years; (iv) 50% to 75% for the

2017 tax year; and (v) 50% to 70% for the 2017 and 2018 tax years.  Accordingly, OTR-

MCC/Brookwood's expert assumed a 40% renewal probability for new leases and a 60% renewal

probability for existing leases for all tax years at issue.

OTR-MCC/Brookwood's expert then multiplied his concluded tenant improvement

allowance by the renewal probability to determine a weighted average and divided that weighted

average by his concluded seven-year average lease term to determine a stabilized annual tenant

improvement allowance.  OTR-MCC/Brookwood's expert's calculation is as follows:

| 2009 to 2016 tax years | | | | | |
|---|---|---|---|---|---|
| Lease type | TI Allowance | Renewal probability | Weighted average | Avg. lease term | Stabilized allowance |
| New | $30.00 psf | 40% | $12.00 psf | 7 years | $1.71 psf |
| Renewal | $10.00 psf | 60% | $6.00 psf | 7 years | $0.86 psf |
| | | | | TOTAL | $2.60 psf |

| 2017 to 2019 tax years | | | | | |
|---|---|---|---|---|---|
| Lease type | TI Allowance | Renewal probability | Weighted average | Avg. lease term | Stabilized allowance |
| New | $35.00 psf | 40% | $14.00 psf | 7 years | $2.00 psf |
| Renewal | $15.00 psf | 60% | $9.00 psf | 7 years | $1.29 psf |
| | | | | TOTAL | $3.30 PSF |

OTR-MCC/Brookwood's expert then applied his concluded stabilized allowances to the

subject property's 529,362 square feet of leasable area to compute the following tenant

improvement allowances: (i) $1,376,341 (529,362 x $2.60 psf = $1,376,341) for the 2009 to 2016 tax years; and (ii) $1,746,895 (529,362 x $3.30 psf = $1,746,895) for the 2017 to 2019 tax years. OTR-MCC/Brookwood's expert then deducted his computed tenant improvement allowance from the subject property's effective gross income for each year under appeal.

Similarly, to compute his tenant improvement allowance, Parsippany's expert examined the subject property's leases and Class A office lease work letters for tenant improvement allowances in the Parsippany-Troy Hills office submarket. Based on his examination of the marketplace, Parsippany's expert concluded that tenant improvement allowances ranged from $10.00 to $15.00 per square foot during the tax years at issue. Ultimately, Parsippany's expert concluded that a $15.00 per square foot tenant improvement allowance was reasonable for all years under appeal. In addition, in Parsippany's expert's opinion, tenant improvements have a ten-year life expectancy and leases generally experience a 75% renewal rate. Accordingly, Parsippany's expert concluded that a stabilized tenant improvement allowance of $2.50 per square foot should be applied to the subject property's 529,362 square feet of leasable area. In sum, Parsippany's expert deducted a tenant improvement allowance of $1,323,405 (529,362 x $2.50 psf = $1,323,405) for each year under appeal.

Here, based on the testimony and evidence presented, the court finds OTR-MCC/Brookwood's expert's supporting market data and formula for discerning a stabilized tenant improvement allowance to be more reliable and credible. However, the court finds that OTR-MCC/Brookwood's expert's finding that Class A offices in the Parsippany-Troy Hills submarket lease for a "typical 84-month term" is inconsistent with the evidence and market data. As recited above, the court's review of the subject property leases and the comparable Class A office leases produced by the experts revealed that Class A office lease terms average approximately eight

years. Accordingly, in determining the stabilized tenant improvement allowance expense, the court will employ an eight-year average lease term and amortization period resulting in a $2.25 per square foot tenant improvement allowance for the 2009 to 2016 tax years and a $2.88 per square foot tenant improvement allowance for the 2017 to 2019 tax years, computed as follows:

| 2009 to 2016 tax years | | | | | |
|---|---|---|---|---|---|
| Lease type | TI Allowance | Renewal probability | Weighted Average | Avg. lease term | Stabilized allowance |
| New | $30.00 psf | 40% | $12.00 psf | 8 years | $1.50 psf |
| Renewal | $10.00 psf | 60% | $6.00 psf | 8 years | $0.75 psf |
| | | | | TOTAL | $2.25 psf |

| 2017 to 2019 tax years | | | | | |
|---|---|---|---|---|---|
| Lease type | TI Allowance | Renewal probability | Weighted Average | Avg. lease term | Stabilized allowance |
| New | $35.00 psf | 40% | $14.00 psf | 8 years | $1.75 psf |
| Renewal | $15.00 psf | 60% | $9.00 psf | 8 years | $1.13 psf |
| | | | | TOTAL | $2.88 PSF |

F. Capitalization Rate

The direct capitalization technique is used "to convert an estimate of a single year's income expectancy into an indication of value in one direct step, either by dividing the net income estimate by an appropriate capitalization rate or by multiplying the income estimate by an appropriate factor." The Appraisal of Real Estate at 491; Hull Junction Holding Corp., 16 N.J. Tax at 80-81. Thus, the capitalization rate is the device that converts a property's net operating income into an estimate of value.

Here, in deriving their capitalization rates, OTR-MCC/Brookwood's expert and Parsippany's expert reviewed data, including investor surveys and published capitalization rates, however, they primarily relied on the Band of Investment technique.[39] The Band of Investment

---

[39] "[T]he Tax Court has accepted, and the Supreme Court has sanctioned, the use of data collected and published by the American Council of Life Insurance." Hull Junction Holding Corp., 16 N.J.

technique "is a form of 'direct capitalization' which is used 'to convert a single year's income estimate into a value indication.' The technique includes both a mortgage and an equity component." Hull Junction Holding Corp., 16 N.J. Tax. at 80-81 (quoting Appraisal Institute, The Appraisal of Real Estate, 467 (10th ed 1992)). When employing the "Band of Investment technique, it is incumbent upon the appraiser to support the various components of the capitalization rate analysis by furnishing 'reliable market data . . . to the court as the basis for the expert's opinion so that the court may evaluate the opinion.'" Id. at 82 (quoting Glen Wall Assocs., 99 N.J. 265, 279-80 (1985)).

OTR-MCC/Brookwood's expert consulted Korpacz/PwC National Suburban Office investor surveys, Viewpoint National Suburban Office investor surveys, American Council of Life Insurers ("ACLI") Investment Bulletins,[40] NKF Financing Rate surveys, Integra Realty Resources Financing Rate surveys, and RealtyRates.com investor surveys to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates.[41]

Similarly, Parsippany's expert consulted Korpacz/PwC National Suburban Office investor surveys (including the Korpacz Dividend Indicator and PwC Yield Indicator), American Council of Life Insurers ("ACLI") Investment Bulletins, and RealtyRates.com investor surveys to derive his mortgage interest rates, loan-to-value ratios, amortization terms, and equity dividend rates.

---

Tax at 82-83. "Relevant data is also collected and published by . . . Korpacz [PWC] Real Estate Investor Survey." Id. at 83. By scrutinizing and "analyzing this data in toto, the court can make a reasoned determination as to the accuracy and reliability of the mortgage interest rates, mortgage constants, loan-to-value ratios, and equity dividend rates used by the appraisers." Ibid.

[40] The ACLI Bulletins reproduced by OTR-MCC/Brookwood's expert and contained in the Addendum to his appraisal reports were barely legible.

[41] OTR-MCC/Brookwood's expert relied on the Viewpoint National Suburban Office investor surveys for only the 2010 to 2016 tax years, NKF Financing Rate surveys only for the 2009 tax year, and Integra Realty Resources Financing Rate surveys only for the 2010 to 2016 tax years.

The following charts detail the Band of Investment components and the concluded capitalization rates of the experts:

|  | 10/1/2008 | 10/1/2009 | 10/1/2010 | 10/1/2011 | 10/1/2012 | 10/1/2013 |
|---|---|---|---|---|---|---|
| OTR-MCC/ Brookwood's expert | Int.: 7.50% LTV: 60% Amort.: 30 yr Eq. div.: 10% CAP: 9.00% | Int.: 7.50% LTV: 60% Amort.: 30 yr Eq. div.: 10% CAP: 9.00% | Int.: 5.00% LTV: 55% Amort.: 30 yr Eq. div.: 10% CAP: 8.00% | Int.: 4.50% LTV: 60% Amort.: 30 yr Eq. div.: 12% CAP: 8.50% | Int.: 4.00% LTV: 55% Amort.: 25 yr Eq. div.: 11% CAP: 8.00% | Int.: 4.50% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.25% |
| Parsippany's expert | Int.: 7.00% LTV: 70% Amort.: 25 yr Eq. div.: 7% CAP: 8.04% | Int.: 7.00% LTV: 70% Amort.: 25 yr Eq. div.: 8% CAP: 8.34% | Int.: 5.25% LTV: 75% Amort.: 25 yr Eq. div.: 8% CAP: 7.39% | Int.: 5.00% LTV: 75% Amort.: 25 yr Eq. div.: 7.5% CAP: 7.15% | Int.: 5.00% LTV: 75% Amort.: 25 yr Eq. div.: 7% CAP: 7.02% | Int.: 5.50% LTV: 75% Amort.: 25 yr Eq. div.: 7.25% CAP: 7.34% |

|  | 10/1/2014 | 10/1/2015 | 10/1/2016 | 10/1/2017 | 10/1/2018 |
|---|---|---|---|---|---|
| OTR-MCC/ Brookwood's expert | Int.: 4.00% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.00% | Int.: 4.00% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.00% | Int.: 4.00% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.00% | Int.: 4.00% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.00% | Int.: 4.00% LTV: 55% Amort.: 30 yr Eq. div.: 11% CAP: 8.00% |
| Parsippany's expert | Int.: 5.25% LTV: 70% Amort.: 25 yr Eq. div.: 7.25% CAP: 7.21% | Int.: 5.25% LTV: 70% Amort.: 25 yr Eq. div.: 7% CAP: 7.13% | Int.: 5.00% LTV: 70% Amort.: 25 yr Eq. div.: 6.5% CAP: 6.86% | Int.: 5.00% LTV: 70% Amort.: 25 yr Eq. div.: 6.5% CAP: 6.86% | Int.: 5.00% LTV: 70% Amort.: 25 yr Eq. div.: 6.5% CAP: 6.86% |

At the outset, the court emphasizes that the PwC investor surveys and the capitalization rate information contained therein are not based on actual sale transactions. Rather, they represent the opinions of investors, in national and select regional markets, regarding their investment expectations for hypothetical transactions. As succinctly stated in The Appraisal of Real Estate, when developing a capitalization rate, published surveys are an adequate source of "support rather than as primary evidence of a capitalization rate." Id. at 466 (emphasis added). Accordingly, the court accords the investor surveys little weight in attempting to discern the capitalization rates to be applied to the subject property.

Rather, the court concludes that the Band of Investment technique provides the most accurate and reliable method of deriving a capitalization rate because it is not polluted or impacted

by questions of how potential survey recipients perceived hypothetical transactional questions or how a market perceives an annually reoccurring operating expense.

The court's analysis of the ACLI tables for fixed rate mortgages for office buildings disclosed that during the tax years at issue mortgage interest rates ranged from 3.54% to 7.15%[42] and loan-to-value ratios ranged from 53.13% to 64.2%. In addition, the court's analysis of the ACLI tables for fixed rate commercial mortgages in the Middle Atlantic region, and more specifically, New Jersey, similarly disclosed that during the tax years at issue mortgage interest rates ranged from 3.66% to 7.87%[43] and loan-to-value ratios ranged from 56.7% to 64.9%.[44] Moreover, as recited above, the court finds Parsippany's expert's characterization of the subject property as one of "the finest campus[es] that Parsippany has" to offer and one of the premier Class A office buildings in the Parsippany-Troy Hills marketplace to be accurate. Thus, the court finds that the subject property's caliber would place it in the lower range of the mortgage interest rates and would place it in the higher range of the loan-to-value ratios. Accordingly, based on the experts' testimony and the court's review of the above information, the court concludes that the following interest rates and loan-to-value ratios should apply to the subject property:

|                     | 2009   | 2010   | 2011  | 2012  | 2013  |
|---------------------|--------|--------|-------|-------|-------|
| Interest rate       | 6.875% | 6.875% | 5.00% | 5.00% | 4.25% |
| Loan-to-value ratio | 65%    | 65%.   | 65%   | 65%   | 65%   |

|                     | 2014  | 2015   | 2016   | 2017 | 2018 | 2019 |
|---------------------|-------|--------|--------|------|------|------|
| Interest rate       | 4.25% | 4.125% | 4.125% | 4.0% | 4.0% | 4.0% |
| Loan-to-value ratio | 65%   | 65%    | 65%    | 65%  | 65%  | 65%  |

---

[42] (i) 6.32% to 7.15%, from 2009 to 2010; (ii) 4.60% to 5.04%, from 2011 to 2012; (iii) 3.91% to 4.25%, from 2013 to 2016; and (iv) 3.54% to 4.33%, from 2017 to 2019.

[43] (i) 6.00% to 7.87%, from 2009 to 2010; (ii) 5.02% to 5.46%, from 2011 to 2012; (iii) 3.66% to 4.52%, from 2013 to 2016; and (iv) 3.49% to 4.00%, from 2017 to 2019.

[44] OTR-MCC/Brookwood's expert's appraisal reports state that the NKF Financing Rate Survey is "included in addendum D on pages 188-194." However, the court's review of pages 188-194 of the addendum disclosed Korpacz/PwC National Suburban Office Market publications.

In addition, given the subject property's character, quality, and situs in the Parsippany-Troy Hills Class A office submarket, the court finds that Parsippany's expert's application of a 25-year loan amortization term is more credible and reasonable.

Finally, the court finds that the 10% and 11% equity dividend rates proposed by OTR-MCC/Brookwood's expert were not aligned with the reasonable investment expectations of investors in Class A multi-tenanted office buildings during the tax years at issue. The court emphasizes that the RealtyRates.com equity rates relied on, in part, by OTR-MCC/Brookwood's expert to generate his equity dividend rates contain no property classification detail or geographical reference. Thus, the reported equity dividend rates could be generated entirely from owners of Class B, C, or D buildings in Florida. Accordingly, the court does not find the RealtyRates.com equity dividend rates probative and credible evidence of equity dividend rates for a multi-tenanted Class A office building in northern New Jersey.

Here, the court's review of the Korpacz/PwC Dividend Indicator discloses dividend rates ranging from 6.13% to 8.49% during the tax years at issue. Moreover, the market data disclosed that United States 10-year treasury bonds during the tax years at issue yielded 1.63% to 3.77%. Moreover, Equity REIT's reported dividend yields of 3.53% to 5.09% during the tax years at issue.[45] In addition, OTR-MCC/Brookwood's expert's Viewpoint National Suburban Office investor surveys disclosed rates ranging from 8.30% to 8.76% for the 2013 through 2015 tax years.

Accordingly, based on the court's review of the alternate investment data offered by the experts, the yield rates for United States 10-year treasury bonds, the Viewpoint National Suburban Office investor surveys, and the Equity REIT's dividend yields, the court concludes that

---

[45] As reported in the PwC Real Estate Investor Surveys relied on by both experts and which identified the National Association of Real Estate Investment Trusts as the data source.

Parsippany's expert's proposed equity dividend rates, as modified below, are more closely aligned

with the reasonable expectations of investors during the tax years at issue.  Therefore, the court

will apply the following equity dividend rates to the subject property:

| 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|------|------|------|------|------|------|------|------|------|------|------|
| 7.50% | 7.50% | 8.00% | 8.00% | 7.50% | 7.50% | 7.25% | 7.25% | 7.00% | 7.00% | 7.00% |

Thus, using the Band of Investment technique, the base capitalization rates would be

calculated as follows:

<table>
<tr><td colspan="2"><u>2009 to 2010</u></td><td colspan="2"><u>2011 to 2012</u></td></tr>
<tr><td>Interest rate</td><td>6.875%</td><td>Interest rate</td><td>5.00%</td></tr>
<tr><td>Amortization period</td><td>25 years</td><td>Amortization period</td><td>25 years</td></tr>
<tr><td>Mortgage constant</td><td>8.386</td><td>Mortgage constant</td><td>7.015</td></tr>
<tr><td>Mortgage component</td><td>65% x 8.386 = 5.451</td><td>Mortgage component</td><td>65% x 7.015 = 4.559</td></tr>
<tr><td>Equity divided rate</td><td>7.50%</td><td>Equity divided rate</td><td>8.00%</td></tr>
<tr><td>Equity component</td><td>35% x 7.50 =  2.625</td><td>Equity component</td><td>35% x 8.00 =  2.80</td></tr>
<tr><td>Base Capitalization Rate</td><td>8.08%</td><td>Base Capitalization Rate</td><td>7.36%</td></tr>
</table>

<table>
<tr><td colspan="2"><u>2013 to 2014</u></td><td colspan="2"><u>2015 to 2016</u></td></tr>
<tr><td>Interest rate</td><td>4.25%</td><td>Interest rate</td><td>4.125%</td></tr>
<tr><td>Amortization period</td><td>25 years</td><td>Amortization period</td><td>25 years</td></tr>
<tr><td>Mortgage constant</td><td>6.501</td><td>Mortgage constant</td><td>6.417</td></tr>
<tr><td>Mortgage component</td><td>65% x 6.501 = 4.226</td><td>Mortgage component</td><td>65% x 6.417 = 4.171</td></tr>
<tr><td>Equity divided rate</td><td>7.50%</td><td>Equity divided rate</td><td>7.25%</td></tr>
<tr><td>Equity component</td><td>35% x 7.50 =  2.625</td><td>Equity component</td><td>35% x 7.25 =  2.537</td></tr>
<tr><td>Base Capitalization Rate</td><td>6.85%</td><td>Base Capitalization Rate</td><td>6.71%</td></tr>
</table>

<table>
<tr><td colspan="2"><u>2017 to 2019</u></td></tr>
<tr><td>Interest rate</td><td>4.00%</td></tr>
<tr><td>Amortization period</td><td>25 years</td></tr>
<tr><td>Mortgage constant</td><td>6.334</td></tr>
<tr><td>Mortgage component</td><td>65% x 6.334 = 4.117</td></tr>
<tr><td>Equity divided rate</td><td>7.00%</td></tr>
<tr><td>Equity component</td><td>35% x 7.00 =  2.45</td></tr>
<tr><td>Base Capitalization Rate</td><td>6.57%</td></tr>
</table>

However, after determining the base capitalization rate, a tax factor must be "loaded" or

added to each base capitalization rate to derive an overall capitalization rate.  The tax factor

represents the real estate taxes payable by OTR-MCC/Brookwood.

Both experts concluded that the effective tax rate that should be applied to the base capitalization rate was: (i) 1.809% for the 2009 tax year; (ii) 1.914% for the 2010 tax year; (iii) 2.012% for the 2011 tax year; (iv) 2.095% for the 2012 tax year; (v) 2.261% for the 2013 tax year; (vi) 2.298% for the 2014 tax year; (vii) 2.315% for the 2015 tax year; (viii) 2.374% for the 2016 tax year; (ix) 2.385% for the 2017 tax year; (x) 2.456% for the 2018 tax year; and (xi) 2.533% for the 2019 tax year.

Accordingly, for the reasons set forth above and employing the income-capitalization approach, the court finds the true or fair market value of the subject property to be as follows:

**2009 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $28.00 PSF | @ 529,362 sq. ft. | $14,822,136 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,822,136 |
| LESS: | Vacancy & Collection Loss | @ 18% PGI | ($ 2,667,984) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $12,154,152 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 607,708 | |
| Replacement Reserves | @ 1% of EGI | $ 121,542 | |
| Leasing Commissions | @ 5% of EGI | $ 607,708 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,286,000) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 6,868,152 |
| Base Capitalization Rate: | | 8.08% | |
| Plus: Effective Tax Rate: | | 1.81% | |
| TOTAL CAPITALIZATION RATE: | | 9.89% | |

| | |
|---|---|
| INDICATED VALUE: | $69,445,420 |
| **CONCLUDED VALUE:** | **$69,400,000** |

**2010 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $28.00 PSF | @ 529,362 sq. ft. | $14,822,136 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,822,136 |
| LESS: | Vacancy & Collection Loss | @ 18% PGI | ($ 2,667,984) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $12,154,152 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 607,708 | |
| Replacement Reserves | @ 1% of EGI | $ 121,542 | |
| Leasing Commissions | @ 5% of EGI | $ 607,708 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,286,000) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 6,868,152 |
| | Base Capitalization Rate: | 8.08% | |
| | Plus: Effective Tax Rate: | 1.914% | |
| | TOTAL CAPITALIZATION RATE: | 9.99% | |

| | |
|---|---|
| INDICATED VALUE: | $68,750,270 |
| **CONCLUDED VALUE:** | **$68,800,000** |

**2011 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $26.25 PSF | @ 529,362 sq. ft. | $13,895,753 |
| TOTAL: | POTENTIAL GROSS INCOME | | $13,895,753 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,057,066) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $10,838,687 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 541,934 | |
| Replacement Reserves | @ 1% of EGI | $ 108,387 | |
| Leasing Commissions | @ 5% of EGI | $ 541,934 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,141,297) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 5,697,390 |
| | Base Capitalization Rate: | 7.36 | |
| | Plus: Effective Tax Rate: | 2.012% | |
| | TOTAL CAPITALIZATION RATE: | 9.37% | |

| | |
|---|---|
| INDICATED VALUE: | $60,804,589 |
| **CONCLUDED VALUE:** | **$60,800,000** |

**2012 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $26.25 PSF | @ 529,362 sq. ft. | $13,895,753 |
| TOTAL: | POTENTIAL GROSS INCOME | | $13,895,753 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,057,066) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $10,838,687 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 541,934 | |
| Replacement Reserves | @ 1% of EGI | $ 108,387 | |
| Leasing Commissions | @ 5% of EGI | $ 541,934 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,141,297) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 5,697,390 |
| | Base Capitalization Rate: | 7.36% | |
| | Plus: Effective Tax Rate: | 2.095% | |
| | TOTAL CAPITALIZATION RATE: | 9.46% | |

| | |
|---|---|
| INDICATED VALUE: | $60,226,110 |
| **CONCLUDED VALUE:** | **$60,200,000** |

**2013 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $26.25 PSF | @ 529,362 sq. ft. | $13,895,753 |
| TOTAL: | POTENTIAL GROSS INCOME | | $13,895,753 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,057,066) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $10,838,687 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 541,934 | |
| Replacement Reserves | @ 1% of EGI | $ 108,387 | |
| Leasing Commissions | @ 5% of EGI | $ 541,934 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,141,297) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 5,697,390 |
| | Base Capitalization Rate: | 6.85% | |
| | Plus: Effective Tax Rate: | 2.261% | |
| | TOTAL CAPITALIZATION RATE: | 9.11% | |

| | |
|---|---|
| INDICATED VALUE: | $62,539,956 |
| **CONCLUDED VALUE:** | **$62,500,000** |

**2014 Tax Year**

INCOME:

| | | | |
|---|---|---|---:|
| Office | $27.25 PSF | @ 529,362 sq. ft. | $14,425,115 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,425,115 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,173,525) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,251,590 |

STABILIZED EXPENSES:

| | | | |
|---|---|---:|---:|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 562,580 | |
| Replacement Reserves | @ 1% of EGI | $ 112,516 | |
| Leasing Commissions | @ 5% of EGI | $ 562,580 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,186,718) |

| | | | |
|---|---|---|---:|
| NET OPERATING INCOME | | | $ 6,064,872 |
| | Base Capitalization Rate: | 6.85% | |
| | Plus: Effective Tax Rate: | 2.298% | |
| | TOTAL CAPITALIZATION RATE: | 9.15% | |

| | |
|---|---:|
| INDICATED VALUE: | $66,282,754 |
| **CONCLUDED VALUE:** | **$66,300,000** |

**2015 Tax Year**

INCOME:

| | | | |
|---|---|---|---:|
| Office | $27.25 PSF | @ 529,362 sq. ft. | $14,425,115 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,425,115 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,173,525) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,251,590 |

STABILIZED EXPENSES:

| | | | |
|---|---|---:|---:|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 562,580 | |
| Replacement Reserves | @ 1% of EGI | $ 112,516 | |
| Leasing Commissions | @ 5% of EGI | $ 562,580 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,186,718) |

| | | | |
|---|---|---|---:|
| NET OPERATING INCOME | | | $ 6,064,872 |
| | Base Capitalization Rate: | 6.71% | |
| | Plus: Effective Tax Rate: | 2.315% | |
| | TOTAL CAPITALIZATION RATE: | 9.03% | |

| | |
|---|---:|
| INDICATED VALUE: | $67,163,588 |
| **CONCLUDED VALUE:** | **$67,200,000** |

**2016 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $27.25 PSF | @ 529,362 sq. ft. | $14,425,115 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,425,115 |
| LESS: | Vacancy & Collection Loss | @ 22% PGI | ($ 3,173,525) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,251,590 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 562,580 | |
| Replacement Reserves | @ 1% of EGI | $ 112,516 | |
| Leasing Commissions | @ 5% of EGI | $ 562,580 | |
| Tenant Imp. Allowance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,186,718) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 6,064,872 |
| | Base Capitalization Rate: | 6.71% | |
| | Plus: Effective Tax Rate: | 2.374% | |
| | TOTAL CAPITALIZATION RATE: | 9.08% | |

| | |
|---|---|
| INDICATED VALUE: | $66,793,745 |
| **CONCLUDED VALUE:** | **$66,800,000** |

**2017 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $27.00 PSF | @ 529,362 sq. ft. | $14,292,774 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,292,774 |
| LESS: | Vacancy & Collection Loss | @ 20% PGI | ($ 2,858,555) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,434,219 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 571,711 | |
| Replacement Reserves | @ 1% of EGI | $ 114,342 | |
| Leasing Commissions | @ 5% of EGI | $ 571,711 | |
| Tenant Imp. Allowance | @ $2.88 x 529,362 sq. ft. | $1,524,563 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,540,304) |

| | | | |
|---|---|---|---|
| NET OPERATING INCOME | | | $ 5,893,915 |
| | Base Capitalization Rate: | 6.57% | |
| | Plus: Effective Tax Rate: | 2.385% | |
| | TOTAL CAPITALIZATION RATE: | 8.96% | |

| | |
|---|---|
| INDICATED VALUE: | $65,780,301 |
| **CONCLUDED VALUE:** | **$65,800,000** |

**2018 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $27.00 PSF | @ 529,362 sq. ft. | $14,292,774 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,292,774 |
| LESS: | Vacancy & Collection Loss | @ 20% PGI | ($ 2,858,555) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,434,219 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 571,711 | |
| Replacement Reserves | @ 1% of EGI | $ 114,342 | |
| Leasing Commissions | @ 5% of EGI | $ 571,711 | |
| Tenant Imp. Allowance | @ $2.88 x 529,362 sq. ft. | $1,524,563 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,540,304) |

| | | |
|---|---|---|
| NET OPERATING INCOME | | $ 5,893,915 |
| Base Capitalization Rate: | 6.57% | |
| Plus: Effective Tax Rate: | 2.456% | |
| TOTAL CAPITALIZATION RATE: | 9.03% | |

| | |
|---|---|
| INDICATED VALUE: | $65,270,377 |
| **CONCLUDED VALUE:** | **$65,300,000** |

**2019 Tax Year**

INCOME:

| | | | |
|---|---|---|---|
| Office | $27.00 PSF | @ 529,362 sq. ft. | $14,292,774 |
| TOTAL: | POTENTIAL GROSS INCOME | | $14,292,774 |
| LESS: | Vacancy & Collection Loss | @ 20% PGI | ($ 2,858,555) |
| TOTAL: | EFFECTIVE GROSS INCOME | | $11,434,219 |

STABILIZED EXPENSES:

| | | | |
|---|---|---|---|
| Insurance | @ $0.21 x 529,362 sq. ft. | $ 111,166 | |
| Utilities (net) | @ $1.50 x 529,362 sq. ft. | $ 794,043 | |
| Repairs & Maintenance | @ $2.25 x 529,362 sq. ft. | $1,191,065 | |
| Cleaning/Janitorial | @ $1.25 x 529,362 sq. ft. | $ 661,703 | |
| Management/General/Admin. | @ 5% of EGI | $ 571,711 | |
| Replacement Reserves | @ 1% of EGI | $ 114,342 | |
| Leasing Commissions | @ 5% of EGI | $ 571,711 | |
| Tenant Imp. Allowance | @ $2.88 x 529,362 sq. ft. | $1,524,563 | |
| TOTAL: STABILIZED EXPENSES | | | ($ 5,540,304) |

| | | |
|---|---|---|
| NET OPERATING INCOME | | $ 5,893,915 |
| Base Capitalization Rate: | 6.57% | |
| Plus: Effective Tax Rate: | 2.533% | |
| TOTAL CAPITALIZATION RATE: | 9.10% | |

| | |
|---|---|
| INDICATED VALUE: | $64,768,297 |
| **CONCLUDED VALUE:** | **$64,800,000** |

G.    Subject property sales

In the court's journey to determine the true or fair market value of real property, the focus

of the inquiry is "the price a willing buyer would pay a willing seller." New Brunswick v. State

Div. of Tax Appeals, 39 N.J. at 543.  The term market value has been defined as:

> the most probable price, as of a specified date, in cash or in terms
> equivalent to cash, or in other precisely revealed terms, for which
> the specified property rights should sell after reasonable exposure in
> a competitive market under all conditions requisite to a fair sale,
> with the buyer and seller each acting prudently, knowledgeably, and
> for self-interest, and assuming that neither is under undue duress.

[The Appraisal of Real Estate at 58 (14th ed. 2013).]

Thus, although the sale of a property reflects an exchange of consideration between parties,

it may not be dispositive on the issue of market value.  "[T]here may be instances when the sale

price may not reflect true market value.  In such instances it is for the court to appraise the

circumstances surrounding a sale to determine if there were special factors which affected the sale

price without affecting the true value." Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 282 (1985).

In Parsippany's expert's opinion the subject property's April 2014 sale by OTR-MCC to

Brookwood for $82,400,000 was "arm's length" and credible evidence of the subject property's

true or fair market value.  According to Parsippany's expert, he had discussions with a

representative of Brookwood about the marketing and sale of the subject property, confirming that

it was arm's length, however, he could not recall the representative's name.

Conversely, in OTR-MCC/Brookwood's expert's opinion, the April 2014 sale of the

subject property by OTR-MCC to Brookwood for $82,400,000 represented a leased fee value.

According to OTR-MCC/Brookwood's expert, the subject property was only seventy percent

occupied at the time of the sale and the income stream being generated supported the leased fee

purchase price. In OTR-MCC/Brookwood's expert's opinion, Brookwood was a Boston based investor, unfamiliar with the landscape of New Jersey Class A multi-tenanted office buildings. Based on his discussions with Brookwood's representatives, they believed that a lower stabilized vacancy could be achieved, thereby increasing the income generated and improving its equity position in the subject property.

However, effective cross-examination of OTR-MCC/Brookwood's expert disclosed that Brookwood was not wholly unfamiliar with the New Jersey Class A multi-tenanted office marketplace. Rather, the evidence revealed that Brookwood acquired and sold another Class A multi-tenanted office building in the Morris County, New Jersey marketplace several years prior to its acquisition of the subject property.[46]

In addition, the testimony of OTR-MCC/Brookwood's expert further revealed that on or about December 6, 2019, approximately fourteen months after the latest valuation date involved herein, Brookwood entered into a Purchase and Sale Agreement with Monarch Owner, LLC to sell

---

[46] Cross-examination also disclosed that in or about January 2000, OTR-MCC/Brookwood's expert prepared an appraisal report valuing the subject property on a leased fee basis. In addition, cross-examination revealed that in or about September 2005, one of OTR-MCC/Brookwood's expert's business partners prepared an appraisal report valuing the subject property on a leased fee basis. A leased fee appraisal report values the "ownership interest held by the lessor, which includes the right to the contract rent specified in the lease plus the reversionary right when the lease expires." The Appraisal of Real Estate, 72 (14th ed. 2013). The leased fee approach is influenced by the leasehold interest, including the "remaining term of a lease, the creditworthiness of the tenants, the influence of atypical lease clauses and stipulations, and other factors [that] can affect the value." Id. at 505. Because of these factors, a leased fee appraisal report is of dubious import to this court, which must value the subject property's fee simple estate. See Marina Dist. Development Co., LLC v. City of Atlantic City, 27 N.J. Tax 469, 488 (Tax 2013), aff'd, 28 N.J. Tax 568 (App. Div. 2015), certif. denied, 223 N.J. 354 (2015); Pine Plaza Associates, L.L.C. v. Hanover Twp., 16 N.J. Tax 194, 199 (Tax 1996); Harclay House v. East Orange City, 18 N.J. Tax 564, 569 (Tax 2000); International Flavors & Fragrances, Inc. v. Union Beach Borough, 21 N.J. Tax 403, 423 (Tax 2004). Accordingly, the conclusions of value in the January 2000 and September 2005 appraisal reports were of no consequence to the court and played no role in the court's determination of the subject property's true or fair market value herein.

the subject property. That sale was reportedly consummated for $58,500,000, under deed dated March 9, 2020 and recorded on March 12, 2020 in the Morris County Clerk's Office in Deed Book 23730, Page 1717.

During cross-examination, Parsippany's counsel vigorously questioned OTR-MCC/Brookwood's expert's conclusion valuing the subject property for $31,700,000 for the 2019 tax year, despite Brookwood purportedly having entered into a sales agreement on December 6, 2019 for $58,500,000. Nonetheless, OTR-MCC/Brookwood's expert steadfastly maintained that he believed his 2019 tax year value conclusion was accurate. In his opinion, Monarch Owner, LLC valued the leased fee interest in the subject property, whereas OTR-MCC/Brookwood's expert was required to value, for Tax Court purposes, the subject property's fee simple estate. In OTR-MCC/Brookwood's expert's opinion, the leased fee interest in a property can be worth substantially more than the fee simple estate, depending on the quality and length of the leases being valued.

Here, the court concludes that neither the subject property's April 28, 2014 sale nor the March 9, 2020 sale are dispositive on the issue of the subject property's true or fair market value. See Glen Wall Assocs. v. Wall Twp., 99 N.J. 265, 281-82 (1985) (concluding that "a bona fide sale of property may be indicative of the true value of the property. Such a sale, however, is not dispositive on the issue of value. We recognize that there may be instances when the sale price may not reflect true value. In such circumstances it is for the court to appraise the circumstance surrounding a sale to determine if there were special factors which affected the sale price without affecting the true value"). The court finds credible OTR-MCC/Brookwood's expert's testimony that in arriving at the 2014 purchase price, Brookwood's representatives attributed greater weight to the creditworthiness of the subject property's tenants and the strength of the leases, thereby

valuing the leased fee interest in the subject property.

Moreover, the court finds that the subject property's March 9, 2020 sale between Brookwood and Monarch Owner, LLC was too remote in time to amount to meaningful evidence of the subject property's true or market value as of any valuation date involved herein.

Accordingly, for the foregoing reasons, the court gave no consideration to the subject property's April 28, 2014 sale or March 9, 2020 sale in determining its true or fair market value.

### H. Corrected property tax assessment

Having reached a conclusion of the subject property's true or fair market value for the 2009, 2010, 2011, 2012, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 tax years, the court will endeavor to determine the correct assessments. Under N.J.S.A. 54:51A-6(a), commonly referred to as Chapter 123, when the court is satisfied in a non-revaluation year by the evidence presented "that the ratio of the assessed valuation of the subject property to its true value exceeds the upper limit or falls below the lower limit of the common level range, it shall enter judgment revising the taxable value of the property by applying the average ratio to the true value of the property . . . ." N.J.S.A. 54:51A-6(a). This process involves application of the Chapter 123 common level range. N.J.S.A. 54:1-35a(b). When the ratio of assessed value exceeds the upper limit or falls below the lower limit, the formula for determining the revised taxable value of property, under N.J.S.A. 54:51A-6(a), is as follows:

| True market value | x | Average ratio | = | Revised taxable value |
|---|---|---|---|---|

For the 2009 tax year, the ratio of total assessed value, $57,660,700, to true market value, $69,400,000, yields a ratio of 0.8308%, which falls within the upper limit (87.76%) and lower limit (64.86%) of Parsippany's 2009 tax year Chapter 123 common level range. Consequently, no reduction in the subject property's 2009 local property tax assessment is warranted.

For the 2010 tax year, the ratio of total assessed value, $57,660,700, to true market value, $68,800,000, yields a ratio of 0.8381%, which falls within the upper limit (88.77%) and lower limit (65.61%) of Parsippany's 2010 tax year Chapter 123 common level range. Consequently, no reduction in the subject property's 2010 local property tax assessment is warranted.

For the 2011 tax year, the ratio of total assessed value, $57,660,700, to true market value, $60,800,000, yields a ratio of 0.9484%, which exceeds the upper limit (91.25%) of Parsippany's 2011 tax year Chapter 123 common level range. Consequently, the subject property's revised 2011 tax year assessment calculation is as follows:

$60,800,000   x   .7934 (Average Ratio)   =   $48,240,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2011 tax year will be entered as follows:

| | |
|---|---|
| Land | $18,496,200 |
| Improvement | $29,743,800 |
| Total | $48,240,000 |

For the 2012 tax year, the ratio of total assessed value, $57,660,700, to true market value, $60,200,000, yields a ratio of 0.9578%, which exceeds the upper limit (92.85%) of Parsippany's 2012 tax year Chapter 123 common level range. Consequently, the subject property's revised 2012 tax year assessment calculation is as follows:

$60,200,000   x   .8074 (Average Ratio)   =   $48,605,000 [ROUNDED]

Accordingly, a judgment establishing the subject property's local property tax assessment for the 2012 tax year will be entered as follows:

| | |
|---|---|
| Land | $18,496,200 |
| Improvement | $30,108,800 |
| Total | $48,605,000 |

For the 2013 tax year, the ratio of total assessed value, $57,660,700, to true market value, $62,500,000, yields a ratio of 0.9226%, which falls within the upper limit (98.45%) and lower limit (72.77%) of Parsippany's 2013 tax year Chapter 123 common level range. Consequently, no reduction in the subject property's 2013 local property tax assessment is warranted.

For the 2014 tax year, the ratio of total assessed value, $57,660,700, to true market value, $66,300,000, yields a ratio of 0.8697%, which falls within the upper limit (97.68%) and lower limit (72.20%) of Parsippany's 2014 tax year Chapter 123 common level range. Consequently, no reduction in the subject property's 2014 local property tax assessment is warranted.

For the 2015 tax year, the ratio of total assessed value, $57,660,700, to true market value, $67,200,000, yields a ratio of 0.8580%, which falls within the upper limit (97.07%) and lower limit (71.74%) of Parsippany's 2015 tax year Chapter 123 common level range. Consequently, no reduction in the subject property's 2015 local property tax assessment is warranted.

For the 2016 tax year, the ratio of total assessed value, $57,660,700, to true market value, $66,800,000, yields a ratio of 0.8632%, which falls within the upper limit (97.06%) and lower limit (71.74%) of the Chapter 123 common level range. Consequently, no reduction in the subject property's 2016 local property tax assessment is warranted.

For the 2017 tax year, the ratio of total assessed value, $57,660,700, to true market value, $65,800,000, yields a ratio of 0.8763%, which falls within the upper limit (95.62%) and lower limit (70.68%) of Parsippany's 2017 tax year Chapter the Chapter 123 common level range. Consequently, no reduction in the subject property's 2017 local property tax assessment is warranted.

For the 2018 tax year, the ratio of total assessed value, $57,660,700, to true market value, $65,300,000, yields a ratio of 0.8830%, which falls within the upper limit (96.30%) and lower

limit (71.18%) of Parsippany's 2018 tax year Chapter the Chapter 123 common level range. Consequently, no reduction in the subject property's 2018 local property tax assessment is warranted.

For the 2019 tax year, the ratio of total assessed value, $57,660,700, to true market value, $64,800,000, yields a ratio of 0.8898%, which falls within the upper limit (95.91%) and lower limit (70.89%) of Parsippany's 2019 tax year Chapter the Chapter 123 common level range. Consequently, no reduction in the subject property's 2019 local property tax assessment is warranted.

### III. Conclusion

Accordingly, for the above stated reasons, contemporaneously herewith the court will enter judgments affirming the subject property's 2009, 2010, 2013, 2014, 2015, 2016, 2017, 2018, and 2019 local property tax assessments. In addition, contemporaneously herewith the court will enter judgments reducing the subject property's 2011 and 2012 local property tax assessments.

Very truly yours,

Hon. Joshua D. Novin, J.T.C.